**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0216n.06

**No. 10-4605**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| KEITH COCKRELL, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | **Feb 23, 2012** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Southern |
| CITY OF CINCINNATI, and DAVID HALL, | ) | District of Ohio |
| Individually and in his official capacity, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before:    BOGGS, COLE, and SUTTON, Circuit Judges.

BOGGS, Circuit Judge.  Cincinnati Police Officer David Hall tased Keith Cockrell as he fled from the scene of a non-violent misdemeanor, jaywalking.  Cockrell brought this action under 42 U.S.C. § 1983, alleging that Hall's taser use constituted excessive force.  Hall moved to dismiss on qualified-immunity grounds; the district court denied the motion.  Hall appeals.  To affirm, we would have to answer 'yes' to two questions: (1) Did Hall violate Cockrell's right to be free from excessive force by shooting him with a taser as he fled from the scene of a jaywalking violation? and (2) was it clearly established that Hall's actions were unconstitutional at the time of the incident?  Because we cannot answer the second question in the affirmative, we reverse.

No. 10-4605
*Cockrell v. City of Cincinnati, et al.*

I

Keith Cockrell was in the Fay Apartment Complex[1] on July 3, 2008, visiting his girlfriend, Miranda Jones. Cockrell left Jones's apartment, and crossed the street to borrow a pair of hair clippers from a friend. He jaywalked.[2] Officer Hall observed Cockrell's conduct, got out of his car, and ran toward Cockrell. Cockrell ran away. There is no indication in the record that Hall ordered Cockrell to halt or put him under arrest. After chasing Cockrell for a short distance, Hall deployed his X26 TASER device in "probe mode." The taser temporarily paralyzed Cockrell, causing him to crash headlong into the pavement. Unable to break his fall, he sustained "lacerations and abrasions to his face, chest, [and] arms."

The X26 TASER is a type of electric stun-gun.[3] It has two modes: dart mode—called probe mode here—and drive-stun mode. In dart mode,

---

[1] The Cincinnati police maintain a substation in the Fay Apartment Complex, and patrol the area day and night.

[2] Jaywalking is a minor misdemeanor, which does not normally justify custodial arrest. Hall's counsel suggested at argument that, once Cockrell fled, he was guilty of the more serious misdemeanor of Obstructing Official Business, OHIO REV. CODE § 2921.31, and therefore could have been arrested.

[3] Jack Cover, a NASA scientist, called the stun gun he created "Thomas A. Swift's Electric Rifle," or TASER. *Orsak v. Metro. Airports Comm. Airport Police Dept.*, 675 F. Supp. 2d 944, 951 n.2 (D. Minn. 2009). This acronym paid homage to a book by the Stratemeyer Syndicate, published under the pseudonym Victor Appleton, titled *Tom Swift and His Electric Rifle, or, Daring Adventures in Elephant Land* (1911), where Tom Swift hunted wildlife on the African savannah with an electric rifle he invented. The first appearance of Tom's futuristic weapon, however, was in the slightly earlier book, *Tom Swift in the Caves of Ice, or, The Wreck of the Airship* (1911), where he used the still-unperfected electric rifle to thwart a horde of rampaging musk-oxen. *Id.* at 162–64.

> [t]he X26 uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles. The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. The tasered person also experiences an excruciating pain that radiates throughout the body.

*Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010) (internal citations omitted). In drive-stun mode, "the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock . . . but does not cause an override of the victim's central nervous system as it does in dart-mode." *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc).

The City of Cincinnati's use-of-force policy reminds officers that "they may use whatever force is reasonably necessary to apprehend the offender or affect [sic] the arrest and no more." R. 8-4 at 6 (City of Cincinnati use-of-force policy); *see also id.* at 8 (citing *Graham v. Connor*, 490 U.S. 386 (1989)). It further instructs officers to "avoid using unnecessary violence," *id.* at 6, and requires that any use of force be "reasonable under the circumstances." *Id.* at 8.

The policy also includes specific guidelines for taser use. It recommends that officers "[u]se the TASER X26 for self defense or to control subjects that are actively resisting arrest." R. 8-4 at 9.[4] "When possible," it continues, officers should "give the subject a verbal warning that the

---

[4] Although, at this point, the policy itself is not at issue, we note that the version of the Cincinnati Police Division Procedure Manual Cockrell excerpted in his submission below was not the same policy in effect on July 3, 2008. Rather, the policy Cockrell provided is a March 2010

TASER will be deployed unless exigent circumstances exist that would make it imprudent to do so."

*Ibid.* The policy also provides:

> Officers should avoid using the TASER X26 on obviously pregnant females and those individuals under the age of 7 or over the age of 70 due to the potential for these individuals to fall when incapacitated by the TASER, unless the encounter rises to the level of a deadly force situation. . . . [and] [o]fficers should avoid using the TASER X26 on individuals who are on an elevated surface unless the encounter rises to the level of a deadly force situation.

*Ibid.*

Cockrell filed this 42 U.S.C. § 1983 action in April 2010, alleging that Hall violated his Fourth Amendment right to be free from the excessive use of force. He also sought "a review of the policies and training within the Cincinnati Police Department to insure that Tasers are only deployed consistent with constitutional limits on use of force." Hall moved to dismiss the excessive-force claim on qualified-immunity grounds. The district court denied the motion. It used the three-factor balancing test from *Graham*, 490 U.S. 386, to determine that, taken in the light most favorable to Cockrell, Officer Hall's use of force was objectively unreasonable, and thus violated the Fourth Amendment. The district court then held "that it was clearly established on July 3, 2008 that the use of a taser, against a fleeing . . . non-violent misdemeanant who posed no threat of harm to anyone, was prohibited by the Constitution." R. 10 at 13.[5] Hall appeals.

revision, which replaces an August 2009 version. *See* R. 8-4.

[5] The district court also held that Cockrell's municipal-liability claim, based on the city's policies, could proceed. Appellants do not challenge this conclusion.

II

Section 1983 creates a private right of action against state officials who deprive individuals of their constitutional rights, under color of state law. 42 U.S.C. § 1983. Civil liability, however, does not attach simply because a court determines that an official's actions were unconstitutional. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). We need not address these two elements in order, and indeed "should think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case." *Ibid.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)) (internal quotation marks omitted); *see also* Pierre N. Leval, *Madison Lecture, Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. REV. 1249, 1275–81 (2006) (criticizing rule from *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001), which required that courts decide whether action violated constitution, before deciding whether right allegedly violated was clearly established); *Lyons v. City of Xenia,* 417 F.3d 565, 580–84 (6th Cir. 2005) (Sutton, J. concurring) (same).

Because "[q]ualified immunity is an affirmative defense . . . [t]he defendant bears the burden of pleading" it in the first instance. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). The burden then shifts to the plaintiff, who must show that the official violated a right so clearly established "that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 131 S. Ct. at 2083; *Sheets*, 287 F.3d at 586; *Dominque v. Telb*, 831

F.2d 673, 676–77 (6th Cir. 1987). The plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity." *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005). If the plaintiff fails to carry this burden as to either element of the analysis, qualified immunity applies and the state official is proof against the plaintiff's suit.

We review the denial of a motion to dismiss on qualified-immunity grounds *de novo*, treating all allegations in the complaint as true and drawing all inferences in favor of the non-moving party. *Heyne v. Metro. Nashville Public Schools*, 655 F.3d 556, 562–63 (6th Cir. 2011) ("We apply the ordinary standard used in reviewing motions to dismiss," when considering denial of a motion to dismiss on qualified-immunity grounds) (citing *Back v. Hall*, 537 F.3d 552, 556 (6th Cir. 2008)).

III

We accept *Pearson*'s invitation and begin by considering whether the right allegedly violated was clearly established on the date of the incident. *See Pearson*, 555 U.S. at 236–37. "A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal quotation marks omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Existing case law from our circuit and others, guidance from experts in a field, and even "[t]he obvious cruelty inherent in [a] practice" can contribute to the conclusion that an act was so aberrant that every reasonable official would have understood that it was unconstitutional. *See id.* at 741–46.

"The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be clearly established." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (McConnell, J.). Without question, the use of objectively unreasonable force violates the Fourth Amendment. *Ibid.* (citing *Graham*, 490 U.S. at 395 (1989)). The Supreme Court, however, has "repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 131 S. Ct. at 2084 (internal citations omitted). "In other words, the fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear *which* uses of force are unreasonable." *Casey*, 509 F.3d at 1284 (emphasis in original).

Taking this guidance into account, we define the question this case presents as whether a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command, had a clearly established right not to be tased on July 3, 2008. Because neither case law, nor external sources, nor "[t]he obvious cruelty inherent" in taser use, *Hope*, 536 U.S. at 745, would have put every reasonable officer on notice that Hall's conduct violated the Fourth Amendment in July 2008, we hold that Hall is entitled to qualified immunity, even if he did use excessive force.[6]

---

[6] Because we resolve this case on the 'clearly established' element of qualified immunity, we express no opinion on the constitutionality of Hall's actions.

Cases addressing qualified immunity for taser use fall into two groups. The first involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers. In the face of such resistance, courts conclude either that no constitutional violation occurred, or that the right not to be tased while resisting arrest was not clearly established at the time of the incident. *Mattos*, 661 F.3d 433 (holding, in consolidated cases, that 2004 and 2006 taser deployments constituted excessive force, but did not violate clearly established law, where one plaintiff, a pregnant woman pulled over for speeding, refused to sign citation, became agitated, screamed at officers, clung to steering wheel, and was tased three times, and other plaintiff, also a woman, was shot with taser in dart mode as she stood between officers and her large, drunken, aggressive husband who was under arrest); *McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011) (holding that 2007 taser deployment against misdemeanant who made sudden move toward window while being questioned by police and told not to "try anything stupid" did not constitute excessive force, even though misdemeanant fell out of window to his death after being tased); *Bryan*, 630 F.3d 805 (holding that 2005 taser deployment against motorist yelling angrily and acting erratically after traffic stop for failing to wear seatbelt violated Fourth Amendment, but not clearly established law); *Baird v. Ehlers*, No. C10–1540JLR, 2011 WL 5838431 (W.D. Wash. Nov. 21, 2011) (holding that using taser three times on man who, in "drunken stupor," was physically removed from city bus, and engaged in verbal and physical confrontation with officer, may have been excessive use of force, but that law regarding taser use was not clearly established as of November 2009); *Carter v. City of Carlsbad*, No. 10–CV–1072–IEG, 2011 WL 2601027 (S.D. Cal. June 30, 2011) (holding that use of taser against large, belligerent, drunken ex-marine who "took an offensive fighting stance" may

have been excessive, but did not violate clearly established law on October 31, 2009); *Azevedo v. City of Fresno*, No. 1:09–CV–375, 2011 WL 284637 (E.D. Cal. Jan. 25, 2011) (holding that use of taser against suspect detained during investigation of burglary, who fled after being asked about weapons then was warned to stop, may have violated Fourth Amendment, but did not violate clearly established law, as of November 2007); *Sanders v. City of Dothan*, 671 F. Supp. 2d 1263 (M.D. Ala. 2009) (holding that officer who tased detained, but uncooperative, suspect using drive-stun mode did not violate clearly established law, as of August 2005); *Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137 (W.D. Wash. 2007) (holding that, of five August 2004 taser deployments against suspect who fled scene of residential burglary and refused to obey command to stop, first three were not excessive uses of force, since officer had to make split-second decisions on how to subdue disobedient, fleeing felon, while last two constituted excessive force because suspect was no longer immediate threat; qualified immunity still was appropriate, however, because law was not clearly established).

In the second group of cases, a law-enforcement official tases a plaintiff who has done nothing to resist arrest or is already detained. Courts faced with this scenario hold that a § 1983 excessive-force claim is available, since "the right to be free from physical force when one is not resisting the police is a clearly established right." *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) (quoting *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008)); *see also Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) (holding that tasing non-violent passenger during traffic stop for failure to hang up from 911 call violated clearly established law, as of October 2005); *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008) (holding that repeated use of

taser against subdued defendant lying face-down in swamp water violated clearly established law, as of November 2004); *Casey*, 509 F.3d 1278 (holding that officers' tasing compliant, non-violent misdemeanant violated clearly established law, as of August 2003); *Shekleton v. Eichenberger*, No. C10–2051, 2011 WL 1578421 (N.D. Iowa Apr. 26, 2011) (holding that tasing non-violent misdemeanant, who did not resist arrest, struggle with, or pose a threat to, officers, or attempt to flee, violated clearly established law, as of September 2008); *Borton v. City of Dothan*, 734 F. Supp. 2d 1237 (M.D. Ala. 2010) (holding that tasing mentally disturbed patient who was not under arrest three times, even though she was secured to a gurney with handcuffs and restraints, was violation of clearly established law, as of August 2006); *Orsak*, 675 F. Supp. 2d 944 (holding that officers who pulled cyclist from bike, stood him up, and shot him with taser may have violated clearly established law, as of Spetember 2006); *Asten v. City of Boulder*, 652 F. Supp. 2d 1188 (D. Colo. 2009) (holding that "the unforewarned tasing of a mentally unstable woman [who was not under arrest] in her own home" violated clearly established law, as of October 2006).

This case does not fit cleanly within either group. At no point did Cockrell use violence, make threats, or even disobey a command to stop.[7] He simply fled. Yet flight, non-violent though it may be, is still a form of resistance. *See Azevedo*, 2011 WL 284637, at *8 ("[A]lthough Azevedo was not physically resisting arrest, he was actively fleeing. . . . The active evasion or flight by a non-felon generally favors a police officer's use of non-deadly force."); *Casey*, 509 F.3d at 1281

---

[7] At oral argument, Hall's counsel urged us to infer that Hall ordered Cockrell to stop. There is, however, no evidence of such a command in the record. At this stage, we are required to draw all inferences in Cockrell's favor. *Heyne*, 655 F.3d at 562–63. We therefore assume that Hall said nothing to Cockrell before tasing him.

(noting that determination whether officer used excessive force requires analysis of "whether [the person being pursued was] actively resisting arrest or attempting to evade arrest by flight") (quoting *Graham*, 490 U.S. at 396 (1989)). Neither line of cases, then, dictates a particular result in this scenario; both apply in some measure.

The most we can draw from today's case law, in summary, is this: in no case where courts denied qualified immunity was the plaintiff fleeing, and in at least some of these cases, the court specifically referred to the fact of non-flight. *See, e.g.*, *Casey*, 509 F.3d at 1281 (considering "whether [plaintiff was] actively resisting arrest or attempting to evade arrest by flight"); *Shekleton*, 2011 WL 1578421, at *9 ("In assessing the reasonableness of Deputy Eichenberger's conduct, the Court considers that . . . Shekleton did not struggle with officers, resist arrest, or attempt to escape."). By contrast, in all cases where a plaintiff fled from police, the court held that qualified immunity was appropriate, and some courts referred specifically to the plaintiff's flight. *See, e.g.*, *Azevedo*, 2011 WL 284637, at *8 ("[A]lthough Azevedo was not physically resisting arrest, he was actively fleeing. . . . The active evasion or flight by a non-felon generally favors a police officer's use of non-deadly force."); *Beaver*, 507 F. Supp. 2d at 1144 ("Initially, Mr. Beaver was attempting to flee and the Court has no trouble concluding that the first tasing was justified to stop him."). These broad principles do not establish the contours of the right Hall allegedly violated so clearly that every reasonable officer would know his actions were unconstitutional, even today. It certainly did not do so in July 2008.

Neither does guidance from outside sources show that Hall's actions were objectively unreasonable. The district court emphasized that the Department of Justice[8] and other law-enforcement agencies nationwide "have determined that the use of a taser against a non-violent suspect who is fleeing on foot creates a risk of serious injury and recommend that such use be prohibited or discouraged." It also noted that the manufacturer of the device, TASER International, "warned that the use of the device against individuals who are running can cause serious injury or death." At the same time, "a study by six university departments of emergency medicine found that 99.7 percent of those Tased by police suffer no injuries or, at most, mild ones." *Mattos*, 661 F.3d at 454 (Kozinski, C.J., concurring in part and dissenting in part) (citing William P. Bozeman et al., *Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Against Criminal Suspects*, 53 Annals Emergency Med. 480, 484 (2009)). And "[t]he research division of the Department of Justice concluded that Taser deployment has a margin of safety as great or greater than most alternatives, and carries a significantly lower risk of injury than physical force." *Ibid.* (citing John H. Laub, Director, Nat'l Inst. of Justice, *Study of Deaths Following Electro Muscular Disruption* 30–31 (2011)). Of course, the materials the district court cited focus specifically on suspects fleeing from law enforcement. But this does not diminish the force of arguments concerning tasers' relative safety, as compared to other methods of detaining suspects—even suspects who are running from the police. *See ibid.* (discussing dangers of alternative methods of subduing suspects). Data from outside sources, then, confirms our analysis of taser-use case law:

---

[8] The district court's citation is to a memorandum from the Department of Justice's Civil Rights Division.

it is not clear that every reasonable officer would believe that Hall's actions violated Cockrell's right

to be free from excessive force.

Finally, there is no "obvious cruelty inherent" in the use of tasers, *Hope*, 536 U.S. at

745, which would render Hall's conduct objectively unreasonable. Tasers in general, and

particularly devices like the X26, which are designed to cause temporary paralysis, involve a

significant degree of force. As Judge Murphy of the Eighth Circuit observed: "especially with the

newer tasers, the nature and quality of their intrusion on the individual's Fourth Amendment interests

is somewhat unique in that they render even the most pain tolerant individuals utterly limp."

*McKenney*, 635 F.3d at 362 (Murphy, J., concurring). Similarly, the Ninth Circuit has observed:

"The X26 . . . intrudes upon the victim's physiological functions and physical integrity in a way that

other non-lethal uses of force do not. " *Bryan*, 630 F.3d at 825. However, argues Ninth Circuit

Chief Judge Kozinski, even if tasers do involve a significant degree of force, they are a highly

desirable and extremely effective law-enforcement tool. They allow an officer to deter an

uncooperative suspect from a safe distance, without undue risk to either party. *Mattos*, 661 F.3d at

453–54 (Kozinski, C.J., concurring in part and dissenting in part).[9] We take no position on the

merits of any judge's argument; nor do we need to do so. It is enough to say that such a difference

---

[9] Notably, Chief Judge Kozinski and Judge Murphy cite different studies, reporting different rates of injury to suspects tased. *Compare Mattos*, 661 F.3d at 454 ("a study by six university departments of emergency medicine found that 99.7 percent of those Tased by police suffer no injuries or, at most, mild ones.") *with McKenney*, 635 F.3d at 363 ("As many as thirteen percent of taser targets are injured by falls.").

of opinion among reasonable jurists demonstrates that taser use is not so inherently cruel that it is objectively unreasonable on that basis alone.

IV

In short, it is not clear whether tasing a suspect who fled from the scene of a non-violent misdemeanor constituted excessive force, as of July 2008. Nor is there consensus that taser use is categorically improper, unsafe, or cruel. We cannot, therefore, say that "every reasonable official would have understood that what [Hall was] doing" violated Cockrell's Fourth-Amendment rights. *al-Kidd*, 131 S. Ct. at 2083.

We hold that the district court erred by failing to grant Officer Hall qualified immunity.[10] We REVERSE IN PART the decision below, and REMAND for further proceedings consistent with this opinion.

---

[10] We note that Appellants did not challenge the district court's ruling on Cockrell's claim against the City of Cincinnati. That claim, of course, may proceed.

COLE, Circuit Judge, concurring. I am persuaded that Cockrell, as of July 3, 2008, did not have a clearly established right not to be tased for fleeing from a non-violent misdemeanor. I write separately because, given the totality of the circumstances, I believe that Officer Hall's use of force was excessive.

In several of the cases cited by the majority, in which courts found that the use of a taser against a resisting arrestee constituted excessive force, the courts placed great weight on the officer's failure to warn the suspect prior to deploying the taser. *See Mattos v. Agarano*, 661 F.3d 433, 451 (9th Cir. 2011) (en banc) (finding excessive force and reasoning that the officer's failure to warn the plaintiff before deploying her taser "pushes this use of force far beyond the pale," but that jurisprudence restricting taser usage was not clearly established in August 2006); *Bryan v. MacPherson*, 630 F.3d 805, 831, 833 (9th Cir. 2010) (finding excessive force and noting that the officer's failure to warn the plaintiff before tasing her "militate[s] against finding [the defendant's] use of force reasonable," but that relevant taser jurisprudence was not clearly established in July 2005); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (finding excessive force and a violation of clearly established law, reasoning that "[t]he absence of any warning" before the officer deployed her taser . . . "makes the circumstances of this case especially troubling"). Likewise, the City of Cincinnati's use-of-force policy advises officers to "give the subject a verbal warning that the TASER will be deployed unless exigent circumstances exist that would make it imprudent to do so." R.8-4 at 9.

Here, Hall does not allege that he warned Cockrell of the impending use of his taser—or even that he ordered him to stop—nor does he allege that exigent circumstances prevented him from doing

No. 10-4605
*Cockrell v. City of Cincinnati, et al.*

so. Thus, I would find that his use of a taser under these circumstances violated Cockrell's Fourth

Amendment right to be free from excessive force.