**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0770n.06

**Nos. 11-3165, 11-3181**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

***Jul 17, 2012***

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| CELESTE THOMAS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | On Appeal from the United States |
| v. | ) | District Court for the Southern |
| | ) | District of Ohio |
| ANTHONY PLUMMER and JENNIFER MYERS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before:       BOGGS and GRIFFIN, Circuit Judges; and BARZILAY, Judge.[*]

BOGGS, Circuit Judge.   Officers Jennifer Myers and Anthony Plummer appeal an order denying their respective motions for qualified immunity.   Each argues that the district court erred by answering "yes" to two questions: (1) did each, or both, of them do something unconstitutional? and (2) would every reasonable officer have understood, on the date of the challenged conduct, that what each, or both, did violated the Constitution?   In Officer Myers's case, the district court should have answered "no" to the second question.   In Officer Plummer's case, the district court correctly answered "yes" to both.   For reasons that we discuss below, we reverse in part, affirm in part, and remand for proceedings consistent with this opinion.

---

[*] The Honorable Judith M. Barzilay, Senior Judge for the United States Court of International Trade, sitting by designation.

I

Demetri Washington, driving Celeste Thomas's car, rear-ended a garbage truck on August 23, 2009. Instead of stopping, he drove away.[1] Seeing this, Cincinnati Police Officers Stephanie Glueck and Jennifer Myers initiated a traffic stop. Officer Glueck approached the driver's side of Thomas's car; Officer Myers approached the passenger's side. Officer Glueck asked Washington for his driver's license and proof of insurance. Because Washington could produce neither, Officer Glueck ordered him out of the car. Eventually, Officer Myers retrieved an identification card from one of Washington's pockets. Officer Glueck returned to her patrol car to check Washington's records. Officer Myers and Washington stood side-by-side, talking on the sidewalk. Officer Glueck got out of her car, walked to the sidewalk where Officer Myers and Washington were standing, and immediately put Washington in handcuffs. Washington asked what was happening. Officer Glueck told him: "You have a felony warrant, sir."[2]

Washington vehemently denied having a warrant and started to struggle. The officers attempted to secure Washington, now quite agitated, against the hood of the patrol car. As he shouted: "What the hell do I have a felony warrant for? What the hell you mean [sic]? Felony warrant for what? Are you fucking serious? For what?" Thomas opened the door of the car. Officers Glueck and Myers immediately yelled: "Get back in the car, ma'am. Get in the car now!

---

[1] Washington was driving, Thomas explained, because she had been drinking and did not want to drink and drive.

[2] The warrant was for a felony burglary charge.

Get back in the car now! Get in the car and shut the door! Get in the car and close the door! Close the door! Shut the door!" Washington, meanwhile, continued to struggle, attempting to lift himself off of the hood and protesting: "Oh my God. Get the hell off me! Felony warrant for what? Get off me! Get off me! A felony warrant for what? I don't have no felony warrant [sic]! I don't have no felony warrant [sic]. Get off me! I don't have no felony warrant [sic]."[3]

At this point, Officer Plummer arrived. He approached Washington and said: "Sir, shut the hell up." Officer Glueck instructed Officer Plummer: "Get her back in that car." Officer Plummer approached the car with his gun drawn and his finger on the trigger. He screamed at Thomas: "Get on the ground! Lay down on the ground now! Get down!" Thomas responded: "Do you know my dad is a city councilman?" Officer Glueck joined Officer Plummer. Officer Plummer holstered his gun and took out his taser. Both officers repeatedly ordered Thomas to "get down on the ground." Thomas, still standing and facing the officers, put her arms in the air, then held them out to her side. Officer Plummer began to repeat: "Get down on the ground now, or you're gonna [sic] be tased. Get down on the ground now, or you're gonna [sic] be tased." Thomas asked: "What did I do? What did I do?" Officer Plummer continued: "get down on the ground, lay down on the ground. Get down on the ground, face-down on the ground." Thomas sank to her knees and held her hands above her head. Officer Plummer screamed: "Get. Down. On. The. Ground. Or. You. Will. Be. Tased," walked behind Thomas, who was still kneeling with her hands above her head, and discharged his taser into her back.

---

[3] The parties stipulated in state court, and do not dispute here, that there was, indeed, a valid warrant for Washington's arrest.

Thomas screamed. She fell forward, sobbing: "Oh God. Oh my God." Officers Plummer, Myers, and Glueck stood over her, yelling: "Put your hands behind your back." The officers handcuffed Thomas who, still crying, said: "I didn't do anything. I'm trying. I didn't do anything. Oh my God. I didn't do anything, I swear to God. I swear to God, I don't know what's going on. I didn't do nothing [sic]. What's going on?" The officers took her into custody and put her in a police cruiser. After patting Washington down, the officers put him in the back seat of the other patrol car on the scene. Officer Myers then searched Thomas's car and found an open container of alcohol. Officer Plummer cited Thomas for Obstructing Official Business, and Officer Myers cited Thomas for Possession of an Open Flask. The officers also cited Washington for Operating a Vehicle under the Influence of Alcohol or Drugs.

An Ohio court suppressed the container of alcohol that Officer Myers found, and the City dismissed the Possession-of-an-Open-Flask charge. After a bench trial, a Hamilton County Municipal Court judge acquitted Thomas of Obstructing Official Business. The Cincinnati Police Department investigated the incident, found that Officer Plummer violated Department policy, and fired him.

Thomas later filed this action under 42 U.S.C. § 1983, alleging that Officers Plummer and Myers both violated her Fourth Amendment rights, under color of state law.[4] Officer Myers, she alleged, violated her right to be free from unreasonable searches and seizures by searching the car after taking her and Washington into custody. Officer Plummer, she claimed, used excessive force

---

[4] Initially, Thomas also made a number of state-law claims, which she voluntarily dismissed.

when he tased her in the back, as she knelt with her hands above her head.  Both Officers moved to dismiss on the basis of qualified immunity.

The district court denied both motions.  Officer Myers, the court reasoned, was not entitled to qualified immunity because her search of Thomas's car violated the rule, established in *Arizona v. Gant*, 556 U.S. 332, 343 (2009), that police may not search a vehicle, incident to arrest, unless either: "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or "it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."  That rule, the district court held, was clearly established at the time of Thomas's arrest, since the Supreme Court decided *Gant* "several months before this incident."

The district court also denied Officer Plummer's motion to dismiss.  It began: "The Court has little trouble here finding that a hypothetical reasonable officer would have known that tasing a suspect who is on her knees with her hands in the air is objectively unreasonable."  "[T]he critical fact," it noted, "is that Plummer waited until Plaintiff had actually complied, until any reason for concern had been eliminated, and she was actually on the ground, hands in the air, before he, in a clearly calculated way, moved to stand behind her and fired his taser in her back."  The district court "similarly [had] little trouble finding that Plummer had fair notice that his conduct was unlawful."  First, the court reasoned that the Cincinnati Police Department's use-of-force policy, which Officer Plummer violated, should have provided fair warning that his act was unconstitutional.  Further, it held, in light of analogous cases dealing with the gratuitous use of other law-enforcement tools, such as batons and pepper spray, "Plummer simply could not reasonably have believed that his use of a

taser on a non-resistant subject was lawful." The district court, therefore, also denied Officer Plummer's motion to dismiss. Officers Myers and Plummer appeal.

II

"Every person who, under color of . . . [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. "Qualified immunity," however, "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Qualified immunity is an affirmative defense. Accordingly, the defendant bears the burden of pleading it in the first instance. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008); *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). Once the defendant raises qualified immunity, however, the burden shifts to the plaintiff, who must demonstrate both that the official violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation "that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 131 S.Ct. at 2083 (quotation marks omitted). "If the plaintiff fails to carry this burden as to either element of the analysis, qualified immunity applies and the state official is proof against the

plaintiff's suit." *Cockrell v. City of Cincinnati*, No. 10-4605, 2012 WL 573972, at \*3 (6th Cir. Feb. 23, 2012).

"When a defendant appeals the denial of a motion to dismiss based on qualified immunity, we review de novo whether the complaint alleges violation of a clearly established constitutional right." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011). In so doing, "[w]e apply the ordinary standard used in reviewing motions to dismiss, accepting well-pled factual allegations as true . . . [and] reading the complaint in the light most favorable to the plaintiff." *Id.* at 562–63.

### III

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. In *Gant*, the Supreme Court held that police violate the Fourth Amendment by searching a vehicle, incident to arrest, unless either: "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or "it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." 556 U.S. at 343.

To maintain her Fourth Amendment claim against Officer Myers,[5] Thomas must show: (1) that Officer Myers's search did, indeed, violate the Fourth Amendment; and (2) that, as of August 23, 2009, that violation was so clear that any reasonable officer would have understood that she should not have done what Officer Myers did. *al-Kidd*, 131 S. Ct. at 2080. After *Pearson*, we need not address these two elements in order. 555 U.S. at 236–37. We accept this invitation and hold that, even if Officer Myers's conduct did violate the Fourth Amendment, that violation was not clearly established, as of August 23, 2009.

When Officer Myers searched Thomas's car, both Thomas and Washington were handcuffed and detained in separate police cars. The issue, then, is whether Officer Myers could reasonably have believed that "evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343. This inquiry has two steps. First, we must decide what to treat as the crime of arrest. Then, we must determine whether a reasonable officer could have believed that "evidence relevant to [that] crime . . . might be found in the vehicle." *Ibid.* (internal quotation marks omitted).

---

[5] Below, Officer Myers did not argue that qualified immunity applied to Thomas's Fourth Amendment illegal-search claim. Her motion to dismiss dealt only with federal false-arrest and malicious-prosecution claims, and a state-law claim of intentional infliction of emotional distress. Nevertheless, the district court assumed that Officer Myers intended to assert the defense against Thomas's federal illegal-search claim as well. This may have been error. Qualified immunity is an affirmative defense. Defendants must raise it. *See Summe v. Kenton*, 604 F.3d 257, 269 (6th Cir. 2010) (holding qualified-immunity defense waived where neither party raised qualified immunity in briefs before the district court). To assume that a motion asserting qualified immunity for *some* claims raises qualified immunity for *all* claims may be to vitiate this requirement. However, we need not, and do not, decide here whether Officer Myers waived her qualified-immunity defense to Thomas's illegal-search claim because Thomas did not raise the issue before us. In short, Thomas waived her waiver argument. *See Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006) (explaining that issues not raised in appellant's brief are waived on appeal).

The officers originally took Thomas into custody for "Obstructing Official Business." The basis of the charge was Thomas's behavior during the stop. There could be no "evidence relevant to [Thomas's] crime of arrest," *ibid.*, in the vehicle because the evidence of her offense was the officers' observations. And the district court so held. *See People v. Evans*, 133 Cal. Rptr. 3d 323, 332 (Cal. Ct. App. 2011) ("Nor was it reasonable for officers to believe evidence relevant to Evans's crime of arrest—interfering with a police investigation . . .—might be found in his automobile.").

Washington's arrest is a different story. Officer Glueck handcuffed Washington because there was an outstanding warrant for his arrest on felony burglary charges, then cited him for operating a vehicle while impaired. At oral argument, and in the briefs, the parties dispute which of these offenses counts as "the crime of arrest." Officer Myers argues for operating while impaired; Thomas argues for burglary. Regardless of which crime we choose, however, the result is the same. We, therefore, analyze both offenses, without deciding which one counts as "the crime of arrest."

Whether it was "reasonable to believe evidence relevant to [operating while impaired or burglary] might be found in the vehicle" depends on how we read *Gant*, 556 U.S. at 343. *Gant* itself gives little guidance. "In many cases, as when a recent occupant is arrested for a traffic violation," the Court explained, "there will be no reasonable basis to believe the vehicle contains relevant evidence. But in others . . . the offense of arrest [a drug crime, for instance] will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Id.* at 344 (internal citations omitted).

From this relatively scant exposition, *see Megginson v. United States*, 129 S. Ct. 1982, 1982 (2009) (mem.) (Alito, J., dissenting from decision to grant, vacate, and remand) ("This case thus

appears to present an important question regarding the meaning and specificity of the reasonable suspicion requirement in *Gant*. Because of the ambiguity of the new *Gant* test and the frequency of roadside arrests, I would grant certiorari in this case to provide much needed clarification."), two approaches to *Gant*'s reason-to-believe language have developed. Some courts hold that an officer could reasonably believe that a vehicle contained evidence of the crime of arrest if, and only if, "the offense of arrest of an occupant of a vehicle is, by its nature, for a crime that might yield physical evidence." *Brown v. State*, 24 So. 3d 671, 681 (Fla. Dist. Ct. App. 2009); *see also People v. Nottoli*, 130 Cal. Rptr. 3d 884, 902 (Cal. Ct. App. 2011); *State v. Cantrell*, 233 P.3d 178, 185 (Idaho Ct. App. 2010) (citing *Brown* with approval, and holding: "Cantrell was arrested for DUI, and the DUI supplied the basis for the search."); *United States v. Oliva*, No. C-09-341, 2009 WL 1918458, at *6 (S.D. Tex. July 1, 2009). Other courts have eschewed this categorical approach, reasoning instead that an officer may search a vehicle "when it is reasonable to believe, based upon common sense factors and the totality of the circumstances, that evidence of the offense of the arrest is inside." *United States v. Reagan*, 713 F. Supp. 2d 724, 728 (E.D. Tenn. 2010); *see also People v. Chamberlain*, 229 P.3d 1054, 1057 (Colo. 2010) ("The nature of the offense of arrest is clearly intended to have significance, and in some cases it may virtually preclude the existence of real or documentary evidence, but a broad rule automatically authorizing searches incident to arrest for all other offenses cannot be reconciled with the actual holding of *Gant*."); *Evans*, 133 Cal. Rptr. 3d at 334–37 (adopting *Chamberlain* rationale).

Courts following *Brown* have consistently held that an officer who arrests a driver for operating under the influence has a reasonable belief that there will be evidence of operating under

the influence in the car. *See, e.g.*, *Cantrell*, 233 P.3d at 185 ("Cantrell was arrested for DUI, and the DUI supplied the basis for the search."); *Oliva*, 2009 WL 1918458, at *6 (holding that, because officer arrested defendant for driving while intoxicated, search of vehicle was permissible). Even under the *Reagan*/*Chamberlain* approach, the *Evans* panel opined, "absent unusual circumstances, when a driver is arrested for driving under the influence, or being under the influence, it will generally be reasonable for an officer to believe evidence related to that crime might be found in the vehicle." *Evans*, 133 Cal. Rptr. 3d at 336. *Reagan* itself, however, held that an officer's search of the passenger compartment of a vehicle after arresting the driver for operating under the influence violated *Gant*. *Reagan*, 713 F. Supp. 2d at 733. And it is not entirely clear whether, in this case, Officer Myers could reasonably have believed that she would find further evidence of intoxication in the car.

Although fewer cases deal with burglary as "the crime of arrest," the same principles apply.[6] Under *Brown*, burglary "alone [would make] it reasonable to believe that evidence relevant to the crime, such as burglar tools and stolen property, might be found[.]" *People v. Livingston*, No. C061845, 2011 WL 5128019, at *4 (Cal. Ct. App. Oct. 26, 2011). Indeed, *Brown*, itself, involved an arrest on "two outstanding warrants for theft," 24 So. 3d at 674, and the court "specifically reject[ed] Appellant's argument that the search was not justified because there was no evidence . . . connecting the crime to the vehicle." *Id.* at 677. Under the *Reagan*/*Chamberlain* approach, of

---

[6] Thomas implied, during oral argument, that drunk driving was simply an exception to *Gant*. Not so. Many courts have confronted the *Gant* issue in drunk driving cases. But their analyses are derived from principles that apply equally to other offenses, and can lead to either justifying or invalidating a search.

course, the question would be one of reasonableness. We would have to decide whether the circumstances of Washington's arrest—his driving a car that did not belong to him erratically at night—were enough to make Officer Myers's search reasonable, even though she arrested him on a "months-old" burglary warrant, with no apparent connection to his driving or Thomas's car.[7]

In sum, Officer Myers's search of the vehicle, whether based on Washington's drunk driving or his burglary warrant, was constitutional under *Brown* and its progeny. Under the *Reagan*/*Chamberlain* approach, however, the result would depend on a reasonableness analysis that the parties have not called on us to make. We have not adopted either rubric; nor will we here. It is enough to say that Officer Myers's search of Thomas's car was not so patently unconstitutional "that every reasonable official would have understood that what [she did] violate[d]" Thomas's Fourth Amendment rights. *al-Kidd*, 131 S.Ct. at 2083.

Thomas urges a contrary conclusion. At the threshold, she argues, Officer Myers must concede that the search was illegal. First, she insists that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars us from deciding whether the search violated the Fourth Amendment. Thomas misunderstands *Heck*. In *Heck*, the Supreme Court held that a § 1983 claim cannot proceed if it "would necessarily imply the invalidity of [a state] conviction or sentence," since the proper vehicle for collaterally challenging such a conviction or sentence is a writ of habeas corpus. *Id.* at 487. Here, there is no state conviction to impugn. *Heck* is inapposite.

---

[7] At oral argument, Thomas represented that the warrant was "months old." It is not clear from the record precisely how old the warrant was, in fact.

- 12 -

Next, Thomas argues that Officer Myers cannot litigate the legality of the search because the state trial court granted a motion to suppress, and thus held that the search violated the Fourth Amendment. "It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Under Ohio law,

> a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different.

*Knott v. Sullivan*, 418 F.3d 561, 567–68 (6th Cir. 2005) (quoting *Boone v. Spurgess*, 385 F.3d 923, 927 n.4 (6th Cir. 2004)). Ohio courts hesitate to give preclusive effect to criminal proceedings in subsequent civil litigation because of "[t]he qualitative differences between civil and criminal proceedings." *State ex rel. Ferguson v. Court of Claims of Ohio, Victims of Crime Div.*, 786 N.E.2d 43, 48 (Ohio 2003). This is so even when the defendant sues the State,[8] which prosecuted her, instead of an individual officer who was not a party to the criminal case. *See ibid.*

Here, Officer Myers was not a party to the state proceeding. Thomas dismisses this as insignificant, arguing that Officer Myers and the State were in privity. We have acknowledged, however, that the State of Ohio's contesting a suppression motion does not give the arresting officer "a full and fair opportunity to litigate [her] position as [a] priv[y] of the State of Ohio." *Knott*, 418

---

[8] Ohio has a reparations statute that allows such suits in some contexts. *See* OHIO REV. CODE § 2743.48 (allowing plaintiffs to sue State for damages from wrongful imprisonment).

F.3d at 568. Thus, we do not allow a plaintiff to use issue preclusion offensively to prevent an officer from arguing that a search held unconstitutional in a state suppression proceeding was, in fact, constitutional in a later § 1983 suit. *Ibid.* ("declin[ing] to give preclusive effect to [a] state-court suppression order and instead consider[ing] de novo the constitutional validity of [a] search warrant."); *Potts v. Hill*, 77 F. App'x 330, 335 (6th Cir. 2003) ("[U]nder Ohio law, a § 1983 plaintiff cannot use issue preclusion against his arresting officers in evaluating the constitutionality of the arrest even if the state court that acquitted the plaintiff found that a constitutional violation took place.").

But more broadly, Thomas's threshold objections are beside the point. Even if Officer Myers's search were illegal—which we do not decide—Thomas would still have to show that the unconstitutionality of the search was clearly established, as of August 23, 2009. For the reasons explained above, she cannot do so. Thomas's threshold objections, therefore, fail.

On the merits, Thomas suggests that the officers arrested Washington only because of his burglary warrant. She notes that there is no connection between the warrant and the car, and argues: "the Appellant has done nothing at all to link the relevant car to any burglaries or obstructions of justice . . . . [I]f the Court were to hold that the warrant was sufficient justification to proceed it would be implicitly overruling *Gant*."

As mentioned above, we do not need to decide whether burglary, operating while intoxicated, or both, count as the crime of arrest. But even if Thomas were right, and burglary were the sole crime of arrest, she is still wrong about the law. Her argument, in essence, relies on our holding Officer Myers to the *Reagan*/*Chamberlain* reading of *Gant*. If we took that course, her claim that

the traffic stop had no connection to the felony warrant could be persuasive. If, however, we adopted the *Brown* formulation, the result would be different. First, burglary is a crime that, "by its nature . . . might yield physical evidence." *Brown*, 24 So. 3d at 681. Second, *Brown* "specifically reject[ed] Appellant's argument that the search was not justified because there was no evidence . . . connecting the crime [of theft] to the vehicle." *Id.* at 677. And finally, the *Brown* approach does not require that the crime underlying the warrant occur soon before the traffic stop.[9] *See State v. McCullough*, 76 So. 3d 399, 400 (Fla. Dist. Ct. App. 2011) ("If [*Brown*'s] reasoning is accurate, then an arrest warrant for a single sale of perishable contraband would authorize a search of the arrestee's vehicle at any time, whether days, months, or even years later, despite the fact that it may not be reasonable to believe any evidence of the original illegal act remained.").

Of course, we do not have to apply either approach. What matters is that, even today, it is not entirely clear whether Officer Myers's search of Thomas's car was unconstitutional. It certainly was not clearly established that her search violated the Fourth Amendment, as of August 23, 2009. *See al-Kidd*, 131 S.Ct. at 2083. The district court erred by failing to grant Officer Myers qualified immunity.

---

[9] This case illustrates why the lack of a temporal limitation is a problem. The record does not indicate how old the warrant was. Had the warrant been issued six months earlier, for instance, it would be odd to hold that an officer could reasonably expect to find evidence of burglary, the crime of arrest, in the vehicle. Still, this appears to be the result that *Brown* requires. Of course, if we added a temporal limitation to *Brown*'s categorical approach, we would turn it into a *Reagan/Chamberlain*-style reasonableness analysis.

IV

"All claims that police officers used excessive force in the course of an arrest should be analyzed under the Fourth Amendment and its 'objective reasonableness' standard." *Bennett v. Krakowski*, 671 F.3d 553, 561 (6th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). To determine whether an officer's use of force was objectively reasonable, we consider the totality of the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We pay "careful attention to the facts and circumstances of . . . [the] case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Throughout this analysis, we must remember that police officers do not sit in an ivory tower. They "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Our calculus "must embody allowance" for these difficult working conditions. *Id.* at 396–97.

"As in other Fourth Amendment contexts . . . the 'reasonableness' inquiry . . . is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Thus, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236–37.

To prevail on her excessive-force claim, Thomas must show: (1) that Officer Plummer's taser deployment constituted excessive force; and (2) that, as of August 23, 2009, it was clearly established that Officer Plummer's use of force was excessive. "The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be 'clearly established.'" *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (McConnell, J.). The Supreme Court recently admonished us "not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 131 S. Ct. at 2084 (internal citations omitted). "In other words, the fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear *which* uses of force are unreasonable." *Casey*, 509 F.3d at 1284 (emphasis in original).

Thomas disobeyed Officer Plummer's original command to lie face-down on the ground. She did not do so through violence or flight, but through questions. By the time Officer Plummer deployed his taser, however, Thomas had assumed a completely submissive position by dropping to her knees and raising her hands above her head. Then, and only then, did he walk behind her and tase her in the back. In light of these facts, the question presented is whether an officer's tasing a once-disobedient suspect who has stopped resisting constituted excessive force, as of August 23, 2009. We hold that it did.

First, like the district court, we have "little trouble finding that a hypothetical reasonable officer would have known that tasing a suspect who is on her knees with her hands in the air is objectively unreasonable." A taser is an electric stun-gun. *See Cockrell*, 2012 WL 573972, at *1

- 17 -

n.3 (explaining origin of term "taser"). In dart mode,[10] it uses metal-tipped "probes" to deliver an electric shock, causing temporary paralysis and intense pain. *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010). Although, some argue, it is a relatively safe and highly effective law-enforcement tool, *see, e.g.*, *Mattos v. Agarano*, 661 F.3d 433, 453–54 (9th Cir. 2011) (en banc) (Kozinski, C.J., concurring in part and dissenting in part), a taser nevertheless "intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not." *Bryan*, 630 F.3d at 825. "[E]specially with the newer tasers, the nature and quality of their intrusion on the individual's Fourth Amendment interests is somewhat unique in that they render even the most pain tolerant individuals utterly limp." *McKenney v. Harrison*, 635 F.3d 354, 362 (8th Cir. 2011) (Murphy, J., concurring). Put simply, "tasers . . . constitute an intermediate or medium, though not insignificant, quantum of force." *Bryan*, 630 F.3d at 826 (internal quotation marks omitted).

The severity of the crime at issue, the first *Graham* factor, calls Officer Plummer's use of such force into question. Officer Plummer placed Thomas under arrest for, and charged her with, obstructing official business, in violation of OHIO REV. CODE § 2921.31. Unless it creates a risk of physical harm, such a crime is a second-degree misdemeanor.[11] *Ibid.* It is not, in other words, a

---

[10] Most tasers have two modes: dart mode and drive-stun mode. *Cockrell*, 2012 WL 573972, at *1. The parties do not specify which mode Officer Plummer used. But since drive-stun mode involves placing the taser against the suspect's skin, and Officer Plummer did no such thing, it appears that he deployed the taser in dart mode.

[11] Officer Plummer's complaint indicated that Thomas's conduct did not create a risk of physical harm.

particularly serious offense. *See, e.g.*, *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (holding that trespassing and obstructing a police officer were not particularly severe crimes).

Of course, the use of force can be reasonable, even when the crime at issue is innocuous. To determine whether this is so, we turn to the last two *Graham* factors: "whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These two factors militate strongly against Officer Plummer's use of force. Without question, Thomas disobeyed Officer Plummer's commands. But obedience is not an on-off switch. Officer Plummer did not use his taser while Thomas was standing, gesturing at him. Instead, he waited until she had dropped to her knees and raised her hands over her head. Then, he walked behind Thomas and tased her in the back. When Officer Plummer deployed his taser, Thomas posed absolutely no threat to his or any other officer's safety; nor did she offer any active resistance. To tase her in this scenario was not reasonable. Officer Plummer violated Thomas's Fourth Amendment rights. *See Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) (holding that officer violated Fourth Amendment by tasing woman who refused to hang up from 911 call during traffic stop of husband on suspicion of driving while intoxicated); *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008) (holding that tasing suspect who had earlier violently resisted arrest, after police had suspect under control, violated Fourth Amendment); *Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137 (W.D. Wash. 2007) (holding that, although officer's tasing fleeing felony suspect three times to prevent flight and maintain control was objectively reasonable, two additional taser deployments, after backup had arrived and

while defendant was already on ground, violated Fourth Amendment because suspect no longer posed immediate threat).

Although Officer Plummer's use of force was excessive, Thomas's claim against him can proceed only if, as of August 23, 2009, "every reasonable official would have understood that what he [was] doing violate[d]" the Fourth Amendment. *al-Kidd*, 131 S.Ct. at 2083. "[T]he right [generally] to be free from physical force when one is not resisting the police [was] . . . clearly established," at least as of July 13, 2002. *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008). We have since applied this general rule in the context of taser use, holding that a suspect not resisting arrest had a clearly established right not to be tased, as of October 28, 2006. *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010); *see also Brown*, 574 F.3d 491 (holding that tasing non-violent passenger during traffic stop for failing to follow order to hang up from 911 call violated clearly established law, as of October 2005). This is so even if the plaintiff had offered, but later abandoned or been forced to abandon, violent resistence. *Landis*, 297 F. App'x 453 (holding that use of taser against plaintiff who violently resisted, but had already been subdued, violated clearly established law, as of November 2004). Here, Thomas surrendered, putting herself at the officers' mercy by falling to her knees and placing her hands above her head. Every reasonable officer would have understood that tasing a suspect in such a position was excessive in August 2009. Officer Plummer is not entitled to dismissal on the basis of qualified immunity.

Officer Plummer offers a number of counter-arguments. None is persuasive. First, he claims that his use of force was objectively reasonable because Thomas, drunk, did not obey his instructions in a tense, quickly evolving encounter. Intoxicated suspects, Officer Plummer argues, are

unpredictable, and Thomas might have offered violent resistance had he or another officer attempted to put her in handcuffs. True, Thomas did not lie face-down on the ground as Officer Plummer ordered. True, the situation was tense. And true, a taser completely incapacitates a suspect, eliminating the possibility of a physical struggle. *See Mattos*, 661 F.3d at 453–54 (Kozinski, C.J., concurring in part and dissenting in part) (arguing that tasers promote officer safety by incapacitating suspects). But none of this excuses Officer Plummer's tasing a kneeling person, who had assumed a position of surrender, in the back. The degree of force was simply incommensurate with the situation.

Second, Officer Plummer argues that Thomas suffered no injury. The complaint, however, alleges that "[Officer Plummer's] actions have caused and continue to cause Ms. Thomas to suffer economic, physical and emotional pain, suffering, and other injuries." This is enough for our purposes. *Heyne*, 655 F.3d at 562–63.

Finally, Officer Plummer claims that, even if he did violate Thomas's Fourth Amendment rights, that violation was not clearly established, as of August 23, 2009.[12] No case in our circuit or elsewhere, he argues, is precisely analogous to this case, *Kijowski* cannot clearly establish that his conduct was unconstitutional because we did not decide it until April 2010, and a series of cases

---

[12] Officer Plummer argues that the Cincinnati Police Department's finding that he violated department policy by deploying his taser, and its subsequent decision to fire him are not relevant to the "clearly established right" analysis. Not so. "[G]uidance from experts in a field, and even the obvious cruelty inherent in a practice can contribute to the conclusion that an act was so aberrant that every reasonable official would have understood that it was unconstitutional." *Cockrell*, 2012 WL 573972, at *3 (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002)) (internal quotation marks and alterations omitted). Thus, the City's findings and action, while not dispositive, could play some role in determining how clearly unconstitutional Officer Plummer's act was.

involving non-compliant plaintiffs supports his claim of qualified immunity. None of these arguments succeeds.

First, this case is, of course, unique. All cases are. But the Supreme Court has made pellucidly "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. The question is not whether the parties can dredge up a precisely analogous case from the federal reports, but whether "the state of the law [at the time of the incident] . . . gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Ibid.*

Second, *Kijowski* can establish that Officer Plummer had enough warning that his conduct was unconstitutional, as of August 23, 2009. Officer Plummer correctly notes that we did not publish *Kijowski* until April 2010. But this is irrelevant. *Kijowski* decided that, at least as of October 2006, a non-resistant suspect had a clearly established right not to be tased. The "state of the law," in other words, gave Officer Plummer ample warning that his use of force was unconstitutional.

Finally, the cases that Officer Plummer cites are inapposite. *Haney v. Dunlap*, No. 1:08 CV 1782, 2009 WL 805142 (N.D. Ohio Mar. 26, 2009), and *Devoe v. Rebant*, No. 05-71863, 2006 WL 334297 (E.D. Mich. Feb. 13, 2006), both involved active physical resistance. Haney led police on a high-speed chase after they accused him of shoplifting. When the chase ended, Haney fled on foot. Eventually, an officer caught him and knocked him to the ground. As he "continued to struggle" with that officer, another officer arrived and deployed his taser. *Haney*, 2009 WL 805142, at *1. This, the district court held, was a reasonable use of force. *Id.* at *3. DeVoe, a Detroit policeman

who lived in a high-crime area, was moving tools from his truck to his garage at night. Two City

of Eastpointe police officers encountered DeVoe (who, at the time, was wearing "dark clothes" and

"holding a briefcase and a plastic bag"), while investigating a reported burglary. *Devoe*, 2006 WL

334297, at *1. The officers made contact with DeVoe, who was verbally combative. Ultimately,

the officers tried physically "to . . . move Mr. DeVoe into the police car. When Mr. DeVoe resisted,

Officer Sommerfeld administered a short 'drive stun' with his taser gun to Mr. DeVoe's lower right

back." *Id.* at *2 (record citations omitted). The district court held that this use of force was

objectively reasonable. *Id.* at *7. Neither of these cases informs our decision, since both involved

active physical resistance. Thomas did no such thing, kneeling on the ground with her hands above

her head. *Haney* and *Devoe* are inapposite.

Also distinguishable is the third case Officer Plummer cites, *McGee v. City of Cincinnati

Police Dep't*, No. 1:06-CV-726, 2007 WL 1169374 (S.D. Ohio Apr. 18, 2007). There, police

attempted to pull McGee over, after they saw him sell drugs to a confidential informant. McGee did

not stop, however, until "an undercover police officer drew his weapon and stepped into the road,

blocking [his] path." *Id.* at *1. After he stopped, "McGee stepped out of the car with his hands

raised above his head." *Ibid.* An officer

> drew his taser and ordered McGee to the ground. Rather than comply . . . McGee
> turned away . . . took off his hat, and put it in his car While [the officer] continued
> to order McGee to lie on the ground, McGee turned back around . . . this time with
> his hands at waist level. One of the [other] officers yelled, "Check him for a gun.
> Gun. Gun." Immediately thereafter, [the officer who had ordered McGee to the
> ground] deployed his taser, hitting McGee's chest and causing McGee to fall to the
> ground

*Ibid.* (record citations omitted). The district court held that the officer's taser deployment was reasonable. *Id.* at *5. It mentioned McGee's failure to comply with the officers' orders, but emphasized the concern that McGee could have been armed. *Ibid.* ("While ostensibly McGee only reached into his car to place his hat inside, the officers could not have know [sic] his motive at the time and could reasonably have suspected that McGee reached into the car to retrieve a weapon. Officer Rackley did not deploy his taser until after McGee failed to comply with his instruction to get down on the ground and another officer shouted 'Check for a Gun. Gun. Gun.' Under the circumstances, a reasonable officer may have believed that McGee was indeed carrying a weapon and that the use of the taser was warranted to avoid potential violence."). To bolster its conclusion, the district court cited the "multitude of cases in which courts have held that the use of non-deadly force, such as pepper-spray or a taser, *to subdue a defendant who is armed or who poses an immediate threat* does not amount to excessive force." *Ibid.* (emphasis added) (citations omitted). Unlike the officer in *McGee*, Officer Plummer had no "reason to believe that [Thomas] posed a threat," *ibid.*, as she knelt on the ground with her hands above her head. *McGee* does not vindicate his use of force.

V

In sum, we REVERSE the district court's decision to deny Officer Myers qualified immunity. We AFFIRM the district court's denial of Officer Plummer's motion to dismiss, however, since every reasonable officer would have known that his tasing Thomas was excessive force, as of August 23, 2009. We REMAND to the district court for proceedings consistent with this opinion.