RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0003p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MICHAEL G. KENT,

*Plaintiff-Appellee,*

*v.*

No. 14-2519

OAKLAND COUNTY,

*Defendant,*

CLAUDIO LOPEZ and CHRISTINA MAHER,

*Defendants-Appellants.*

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:13-cv-15003—Judith E. Levy, District Judge.

Argued: August 6, 2015

Decided and Filed: January 6, 2016

Before: SUHRHEINRICH and MOORE, Circuit Judges; VAN TATENHOVE, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:** Rick J. Patterson, POTTER, DEAGOSTINO, O'DEA & PATTERSON, Auburn Hills, Michigan, for Appellants. Craig M. Weber, THE GOOGASIAN FIRM, P.C., Bloomfield Hills, Michigan, for Appellee. **ON BRIEF:** Rick J. Patterson, Steven M. Potter, Robert C. Clark, POTTER, DEAGOSTINO, O'DEA & PATTERSON, Auburn Hills, Michigan, for Appellants. Craig M. Weber, THE GOOGASIAN FIRM, P.C., Bloomfield Hills, Michigan, for Appellee.

VAN TATENHOVE, D.J., delivered the opinion of the court in which MOORE, J., joined. SUHRHEINRICH, J. (pp. 18–25), delivered a separate dissenting opinion.

───────────────

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

---

**OPINION**

---

GREGORY F. VAN TATENHOVE, District Judge.   The events underlying this civil rights action alleging excessive force arose when Oakland County Sheriff's Deputies Claudio Lopez and Christina Maher responded to the natural, at-home death of Plaintiff Michael Kent's father.   Adamant that his father had not wished for life-sustaining procedures, Kent vehemently objected to emergency medical technicians' efforts to attach an Automated External Defibrillator to resuscitate his father.   When Kent yelled at the deputies and refused to calm down as commanded, he was tased.   This action pursuant to 42 U.S.C. § 1983 followed.   The district court found that the deputies' use of the taser was objectively unreasonable and violated clearly established law, and it denied the deputies' motion for summary judgment on qualified and governmental immunity grounds.   We reach the same conclusions and affirm.

**I**

Michael Kent lives in Commerce Township, Michigan, with his wife and young children. A few days before the incident in question, Kent's parents Rick and Pamela traveled from out of state for a visit and were staying with the family in Kent's home.   Kent's father suffered from a number of serious health problems for several years, and he spent the majority of his visit in bed in significant pain.   On the morning of September 1, 2013, Kent, who happens to be a physician, found that his father was "unresponsive to any stimulus" but still breathing with a carotid pulse. He knew at that point that his father was dying.   Rick Kent had executed a living will, which provided that he did not want his life "artificially prolonged by life-sustaining procedures."   In accordance with his father's wishes, Kent made his father as comfortable as possible in the guest bedroom.   At 7:08 p.m. that evening, Kent determined that his father had passed away: he was no longer breathing and carried no pulse, and his pupils were fixed and dilated.   Kent's wife called the non-emergency dispatch to report the natural death.

Firefighter-EMT Anthony Oryszczak arrived around 7:30 p.m. and was directed to the upstairs bedroom.   Oryszczak briefly examined the body and asked whether a hospice nurse was present.   Kent informed Oryszczak that he was a physician and that his father had passed away

about fifteen minutes earlier.  As Deputy Lopez arrived, EMT Oryszczak asked whether Kent had a do-not-resuscitate order or power of attorney paperwork.  Kent explained that his father was visiting from out of state, and he "wasn't sure if [his] mother had brought any paperwork with her."  He told Oryszczak that his mother had power of attorney, and that it was his father's wish that no "heroic measures" or attempts at resuscitation be taken upon his death.  According to Lopez, Kent's mother was also asked for any do-not-resuscitate documents.  She reiterated that she had power of attorney but did not have the paperwork with her, and she left the bedroom to try to contact a family member who could send the documents.

EMT Oryszczak then radioed for his partner to come assist him in "work[ing] [the patient] up."  When Kent asked what this meant, Oryszczak explained that in the absence of proper do-not-resuscitate paperwork, emergency responders' protocol required them to attach an Automated External Defibrillator[1] to "determine if there were signs of life" and "do everything" they could for the patient.  Kent understood this to mean that the EMTs would take "all measures to resuscitate [Kent's] father because there was no [do-not-resuscitate order or durable power of attorney]."

The situation escalated at this point.  Kent began yelling at the deputies and EMTs, telling them that they "were not going to assault [his] dead father or [he] was going to call the police and have them all thrown in jail."  He questioned whether the EMTs "even knew what a DPOA [durable power of attorney] was" and insisted that his mother, as the medical proxy for his father, could tell them what his father's wishes were.  Deputy Maher arrived around this time and saw that Kent was gesturing with his hands and "flailing" his arms in the air.  Deputy Lopez and an EMT recall that Kent called Oryszczak an "asshole" several times, though Kent does not recall this in his witness statement.

---

[1]An AED is a portable electronic device used by emergency responders to restore a patient's heart to a normal rhythm after a sudden cardiac arrest.  *How Does an Automated External Defibrillator Work?*, NAT. INSTS. HEALTH, NAT. HEART, LUNG, & BLOOD INST., http://www.nhlbi.nih.gov/health/health-topics/topics/aed/howdoes (last visited July 23, 2015).  Emergency responders attach electrodes ("sticky pads with sensors") to the patient's chest.  *Id.*  These electrodes detect the patient's heart rhythm, and a computer analyzes that information to determine whether an electric shock is necessary.  If a shock is needed, the AED's computer will prompt the emergency responder when to push a button to administer the shock, which is delivered through the electrodes.  *Id.*  A shock can restore the heart's normal rhythm, "if done within minutes of the onset of [sudden cardiac arrest]." *When Should an Automated External Defibrillator Be Used?*, NAT. INSTS. HEALTH, NAT. HEART, LUNG, & BLOOD INST., http://www.nhlbi.nih.gov/health/health-topics/topics/aed/when (last visited July 23, 2015).

At some point, EMT Oryszczak told Deputy Lopez that he "had an obligation to render aid to the deceased," whom he recalled "did not have obvious signs of death" at that time. Oryszczak asked for the deputies' assistance and told Lopez he could not perform his duties "because he was in fear of Michael Kent intervening." The deputies began attempting to deescalate the situation. According to Kent, Deputy Maher "put her hand on her gun and commanded [him] to calm down." He admits that he refused and told both deputies that "I did not have to calm down, that it was my home and that they were not going to assault my dead father in my home against his wishes." According to Deputy Maher, Kent also refused to comply with her command to lower his hands, saying, "Don't you touch me," although Kent does not recall this in his written statements. Around this time, another EMT on the scene called for back-up officers.

Deputy Lopez recalls that he asked Kent to come downstairs and talk with him. Kent refused, and Lopez says that he then "yelled at Kent that he had to leave the room." Lopez says Kent told him to "get out of his house," but Kent does not recall this exchange in his written statements. Lopez then pulled out his taser and told Kent that if he did not calm down,[2] Lopez was going to tase him. Kent, who says he was standing with his hands raised in the air and his back to the wall at this point, undisputedly said, "Go ahead and Taze me, then." Lopez deployed the taser in dart mode. The prongs struck Kent in the stomach and chest, and he fell to the floor. After the five-second taser cycle, Deputy Maher ordered Kent to present his hands for handcuffing, and he complied. Kent continued to yell at the deputies, asking whether he was under arrest and what laws he had broken. He claims he got no response for several minutes, until deputies finally told him that he was not under arrest.

Kent remained handcuffed, with the taser probes still attached, during fifteen to twenty minutes of questioning by another non-party deputy. EMTs then removed the probes and dressed Kent's wounds, after which Maher removed the handcuffs. Meanwhile, EMTs "ran a

---

[2]Lopez says that he told Kent that he would use the taser if Kent did not leave the room. But no other written statements from those on the scene recall that Kent was commanded to leave the room. In this interlocutory appeal of a denial of qualified immunity, the Court views the evidence and draws all reasonable inferences in the light most favorable to the plaintiff. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675 (6th Cir. 2013); *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 496 n.7 (6th Cir. 2012). We therefore assume that Kent was commanded to calm down, and was not ordered to leave the room.

strip" on Kent's father (presumably conducting an AED initial assessment of the patient's carotid pulse). He was pronounced dead around 7:45 p.m. The entire incident therefore lasted around twenty minutes or less.

Kent filed suit in the Eastern District of Michigan against Oakland County and Deputies Lopez and Maher on December 10, 2013. He claimed, under 42 U.S.C. § 1983, that the deputies had violated his Fourth Amendment rights. Specifically, he alleged that Deputy Lopez's use of the taser amounted to excessive force and that Deputy Maher failed to prevent the use of excessive force. He also brought state law assault and battery claims against the deputies. Before any depositions were taken,[3] the deputies moved for summary judgment based on qualified and governmental immunity.

The district court found that there were genuine issues of material fact as to "whether EMS and defendants felt they were faced with an emergency," whether "emergency personnel had, or even thought they had, a legal obligation to attempt resuscitation," and whether "Kent was, in fact, non-compliant." The court went on to find that Deputy Lopez's use of force was objectively unreasonable and that case law clearly established that the use of a taser on an individual who was "not under arrest, posed no safety threat to officers or others, made no such verbal threats, was not physically resistant, and may have actually shown physical compliance, constituted excessive force." It therefore concluded that the deputies were not entitled to qualified and governmental immunity and denied their motion for summary judgment. The deputies appeal that decision.

## II

This court has jurisdiction to review a district court's interlocutory denial of qualified immunity to the extent that the appeal raises issues of law. *Stoudemire v. Michigan Dep't of*

---

[3]The district court relied on witness statements and incident reports in resolving the summary judgment motion. One of those documents is an unsworn, unsigned, and undated narrative statement, presumably authored by Michael Kent. While the Federal Rules no longer require a formal affidavit for summary judgment motions, some "written unsworn declaration, certificate, verification, or statement . . . *subscribed by [the declarant] as true under penalty of perjury*" is still required. 28 U.S.C. § 1746 (emphasis added). Because the deputies offered this document as an exhibit to their own motion, however, any objection they may have had was waived, and we may consider the defective declaration for purposes of this appeal. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994); 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738 (3d ed. 1998).

*Corr.*, 705 F.3d 560, 564 (6th Cir. 2013). We do not, however, review a district court's determination that the record sets forth genuine issues of material fact for trial. *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 495 (6th Cir. 2012) (citing *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995)). Rather, "a defendant denied qualified immunity may appeal . . . [only] if the issue on appeal is whether the plaintiff's facts, taken at their best, show that the defendant violated clearly established law." *Quigley*, 707 F.3d at 680. "The district court's characterization of the basis for its ruling is not dispositive." *Stoudemire*, 705 F.3d at 564.

A denial of summary judgment on the basis of qualified immunity is subject to *de novo* review. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). In this posture as well, we must "view all evidence, and draw all reasonable inferences, in the light most favorable to [the nonmoving party, Kent]." *Goodwin v. City of Painesville*, 781 F.3d 314, 320 (6th Cir. 2015).

**A**

In determining whether a law enforcement officer is entitled to qualified immunity on an excessive force claim, we ask two questions: (1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident. *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012). We may conduct this analysis in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**1**

Whether an officer's use of force in effecting an arrest violates the Fourth Amendment turns on "whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). In this analysis, we pay "careful attention to the facts and circumstances of . . . [the] case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citations omitted). The ultimate question, however, is "'whether the totality of the circumstances justifies a

particular sort of seizure.'" *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).   Throughout the inquiry, we must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.   We are to consider "'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" *Goodwin*, 781 F.3d at 321 (quoting *Graham*, 490 U.S. at 396), and we must take into account the fact that police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The deputies argue that the first *Graham* factor, the severity of the offense, is irrelevant since Kent was never charged with any crime.   But that fact is precisely what calls Deputy Lopez's use of a taser into question under this factor.   Kent was never arrested and was not told at any time that he was under arrest.   *See e.g.*, *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) (finding excessive force where officer pepper sprayed man who was never told he was under arrest; man also fled police but later put his hands against a wall "without any indication of resistance").   Indeed, there is no evidence that Kent was aware that he would be detained until Deputy Lopez instructed him that he would be tased if he failed to comply with commands.   *See Goodwin*, 781 F.3d at 326 (finding excessive force and noting that there was no evidence that the claimant had "reason to be aware he was being detained").   This is one important consideration in the totality-of-the-circumstances analysis, and it weighs in Kent's favor.

The deputies also insist that Kent posed an immediate threat to the safety of those on the scene, but it is difficult to square that claim with our case law.   While Kent may have prevented EMTs from fulfilling their perceived duties, his conduct does not resemble the physical and immediate safety threat we have found in other cases to justify tasing.   For example, we have found tasing permissible where an individual was armed.   *See Watson v. City of Marysville*, 518 F. App'x 390 (6th Cir. 2013) (holding that tasing did not constitute excessive force where the suspect, who was reported to be armed, reached into bag).   In this case, it is undisputed that Kent was unarmed and made no evasive movements to suggest he had a weapon.   Further, we

have found tasing reasonable where individuals were particularly violent or physically resistant, so as to endanger responders. *See Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94 (6th Cir. 2012) (plaintiff ran from police while "flailing his arms violently"); *Hagans*, 695 F.3d at 511 (plaintiff was "out of control and [] forcefully [] resist[ing] arrest"). There is no evidence that Kent was violently thrashing about in an effort to avoid handcuffing or to flee police, such that he might have harmed the deputies and EMTs in the bedroom. Nor is there any indication that he attempted to hit officers or make a display of force. *See Rudlaff*, 791 F.3d 638, 640 (6th Cir. 2015) (finding tasing reasonable where claimant "puffed out his chest and stared down [the officer]," then swung his arms twice toward officers). At the most, according to Deputy Maher's account, Kent used agitated hand gestures. Kent's actions do not, therefore, amount to the same immediate threat to safety found to justify tasing under our case law.

More importantly, we also assume in this interlocutory appeal that Kent had his hands up and his back against the bedroom wall when he was tased. We have held that an individual poses little threat of harm when her hands are in the air indicating submission. *Grawey*, 567 F.3d at 311 (finding excessive force where an individual approached an officer and initially refused to obey commands to lower his hands, but later had his hands against a wall in submission when the officer pepper sprayed him); *Correa v. Simone*, 528 F. App'x 531 (6th Cir. 2013) (finding no immediate threat of harm, and ultimately finding excessive force, where arrestee—who was armed—had put his hands in the air, ceased resisting, and made no evasive movements); *Thomas v. Plummer*, 489 F. App'x 116, 126 (6th Cir. 2012) (finding that arrestee who had dropped to her knees and raised her hands over her head posed "absolutely no threat to [the officer's] or any other officer's safety"). Sitting in the "'peace of a judge's chambers,'" we take seriously an officer's objectively reasonable belief that an arrestee posed an immediate threat to the officer's safety or the safety of others. *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). But once Kent ceased flailing his arms and assumed this posture, he indicated submission or, at the very least, minimized any immediate safety threat he might have posed to the deputies and emergency responders in the bedroom.

That submissive posture also undermines the deputies' argument that Kent was "actively resisting arrest." We have often found that the reasonableness of an officer's use of a taser turns

on active resistance: "When a suspect actively resists arrest, the police can use a taser [] to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff*, 791 F.3d at 642. *Compare, e.g.*, *Hagans*, 695 F.3d at 511 (holding that officer did not violate clearly established law when he used taser five times in drive stun mode to subdue plaintiff, who refused to be handcuffed, fled from officers, and was "out of control," breaking windows and jumping on top of cars due to what officers later learned was crack cocaine intoxication); *Foos v. City of Delaware*, 492 F. App'x 582 (6th Cir. 2012) (finding that use of taser was reasonable in response to hostile, belligerent, and agitated suspect, who repeatedly revved the engine of his wrecked car as officers arrived on the scene, then began violently thrashing about and reached into back of his vehicle as if to retrieve a weapon), *with, e.g.*, *Goodwin*, 781 F.3d 314 (finding excessive force where suspect, still convulsing from a previous taser application and physically unable to comply with commands to put his hands behind his back and therefore not "actively resisting" arrest, was tased a second time); *Thomas*, 489 F. App'x 116 (finding excessive force where the plaintiff had ceased her verbal resistance and dropped to her knees with her hands above her head at the time she was tased); *Kijowski v. City of Niles*, 372 F. App'x 595 (6th Cir. 2010) (finding excessive force since individual could not have "actively resisted" police in between a rapid series of taser applications); *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008) (finding that officers used excessive force on suspect who had initially fled but, at the time of the officers' repeated tasing, was pinned to the ground with his face in muddy water and ultimately died as a result of drowning). "Active resistance includes 'physically struggling with, threatening, or disobeying officers.'" *Rudlaff*, 791 F.3d at 641 (quoting *Cockrell*, 468 F. App'x at 495). It also includes "refusing to move your hands for the police to handcuff you," *id.* (citing *Caie*, 485 F. App'x at 94), or fleeing from police. *See, e.g.*, *Williams v. Ingham*, 373 F. App'x 542 (6th Cir. 2010) (holding that use of taser in drive stun mode on arrestee who had twice engaged in high-speed car chases with police was reasonable, where, once stopped, arrestee refused to exit his vehicle for handcuffing).

Citing *Eldridge v. City of Warren*, 533 F. App'x 529 (6th Cir. 2013), the deputies insist that Kent was actively resisting arrest because he refused to comply with their commands to calm down and demonstrated "verbal hostility." *Id.* at 535. After comparing and contrasting taser cases from this circuit, the *Eldridge* court noted that active resistance could be

characterized as "noncompliance" that is coupled with "some outward manifestation—either verbal or physical—on the part of the suspect [that] suggest[s] volitional and conscious defiance." *Id.* at 534. One case the *Eldridge* Court considered, *Caie v. West Bloomfield Township*, 485 F. App'x 92 (6th Cir. 2012), provides a useful comparison here. The plaintiff in *Caie* was a suicidal and heavily intoxicated young man who had escaped from the care of relatives and rowed out to the middle of a lake with the reported intention of killing himself. The young man complied with officers' orders to get out of the water, but once onshore, he behaved erratically and commented repeatedly that he "should fight the officers so that they would have a reason to kill him." *Id.* at 94. Concerned that the plaintiff's resistance could escalate into violence, the officers decided to forcibly secure the young man in order to transport him to a hospital for mental health treatment. They were able to partially hold him on the ground, but when he continued to resist by refusing to move his hands for handcuffing, an officer applied a taser in drive stun mode. Judge Donald, writing for the panel, emphasized that plaintiff's highly agitated and intoxicated state, his demonstrated suicidal tendencies, his attempts to flee, and, in particular, his verbal threats of physical violence presented a strong risk to the safety of the officers and the plaintiff himself. *Id.* at 96-97. Under this combination of facts, the court found the officers' use of the taser to be reasonable.

Judge Donald also wrote for the majority in *Eldridge* and found that *Caie* contrasted sharply with that case. In *Eldridge*, the police confronted an erratic driver, who they later discovered was in the midst of a diabetic hypoglycemic episode. Despite several commands to exit his vehicle, the driver did not move and repeatedly said, "I'm fine, thank you," until officers forcibly removed him from the car and tased him multiple times. *Eldridge*, 533 F. App'x at 530-31. The court concluded that the use of a taser in response to Eldridge's passive resistance amounted to excessive force. Not only were Eldridge's verbal statements distinguishable from the direct threats of physical violence seen in *Caie*, but Eldridge also displayed no deliberate physical defiance and had "played no role in escalating the aggression." *Id.* at 535.

We recently contrasted these two cases again in *Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015). In *Goodwin*, officers initially responded to a noise complaint from a loud party in claimant David Lee Nall's apartment in 2010. Sometime after the officers gave Nall a

warning, a guest leaving the party told them that Nall was "crazy" and had threatened to kill the guests and the police. *Id*. at 319. Intending to arrest Nall for disorderly conduct, the officers returned to his apartment and asked him to step outside. Nall refused, told them he did not have to step outside, and closed the door. *Id.* The officers then kicked the door open and tased Nall in dart mode for an unusually long period of twenty-one seconds, then again in drive stun mode. The court held that the officers had used excessive force in the first tasing, since "Mr. Nall's single statement that he would not leave his apartment, or the fact that he remained in his apartment rather than exiting, does not in itself render [the officer's] use of the Taser reasonable." *Id.* at 324. Nall's "passive refusal" to comply with the officers' commands was "more akin to the suspect's refusal to exit his car in *Eldridge* than to the continued resistance and hostility present in the active resistance cases, such as *Caie*, that *Eldridge* distinguishes." *Id.* at 325-26.

The combination of facts that made the use of force reasonable in *Caie* is not present here. Kent admits that he did not fully comply with the deputies' orders to calm down. He also admits that he yelled at officers that he "did not have to calm down," that the emergency personnel "were not going to assault [his] dead father or [he] was going to call the police and have them all thrown in jail," and that he responded to Deputy Lopez's final warning with, "Go ahead and Taze me, then." Kent's language might not resemble the "polite responses" given in *Eldridge*, but it does not approach the direct threat of physical harm made by the plaintiff in *Caie*. And unlike *Caie*, Kent never attempted to flee officers, and he never attempted to prevent officers from handcuffing him. Rather, much like the claimant in *Goodwin*, who, like Kent, refused to comply with an officer's command and verbally indicated as much, Kent's conduct does not resemble the "continued resistance and hostility" often present in our active resistance cases, including *Caie*. *Goodwin*, 781 F.3d at 325-26.

We are keenly aware that, at the time of the incident, the deputies understood that they were obligated to secure the scene so that EMTs could perform their perceived duties,[4] and that

---

[4]The district court and the parties' briefs focused extensively on whether, under substantive Michigan law, relevant city ordinances, and local EMT policies and procedures, there was indeed an emergency or a duty to administer the AED. The deputies, however, are correct that regardless of whether an ongoing medical emergency existed, the Court must judge their conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The district court's substantive analysis of

the deputies were forced to "make split-second judgments [] in circumstances that [were] tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97.  Indeed, distinct circumstances in this fact-sensitive analysis might compel a different conclusion about police use of force in a perceived medical emergency.  For example, in *Stricker*, we upheld the officers' use of force— pointing weapons, using pressure holds, and handcuffing—where they were responding to a possible drug overdose of a young man known to officers as a drug user, after his parents had repeatedly refused to allow the officers or emergency responders to enter their house to treat him. *E.g.*, *Stricker v. Township of Cambridge*, 710 F.3d 350 (6th Cir. 2013).  But *Stricker* did not involve a tasing, and Deputies Lopez and Maher were confronted with a very different scenario than the *Stricker* responders.  Here, the deputies knew they were responding to a natural death investigation and were aware that Kent's father had just passed away some fifteen minutes before they arrived.  *See, e.g.*, *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007) (taking into account the fact that officers were aware that the suspect was "experiencing some sort of mental or emotional difficulty," where mother had called 911 seeking advice about having him hospitalized); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) (citations omitted) ("The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.").

They were also well aware—perhaps most importantly—that the entire incident occurred in Kent's home, one of the most sacred of spaces under the Fourth Amendment's protections. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511) (1961)) ("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"); *see also Goodwin*, 781 F.3d at 327 (turning to the "central purpose of the Fourth Amendment" to hold that Nall's refusal to exit his home, without more, did not constitute active resistance).  Of course, officers are not precluded from using reasonable force in that setting, and it can sometimes be justified in the face of active resistance or an immediate threat to the safety of

---

emergency protocols is, ultimately, off-point: "[W]hat matters is the reasonableness of the officers' belief[,] as they 'did not [know] and could not have known'" whether the use of the AED was actually required under county protocol. *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015) (citations omitted).  Because EMT Oryzsczak told the deputies that he had a duty to render aid to Kent's father and attach the AED, the deputies understood—rightly or wrongly—that their duty was to ensure that the firefighters could perform that task.  We therefore view the incident from that vantage point.

officers or others. *E.g.*, *Stricker*, 710 F.3d 350 (finding forcible entry and pointing of weapons in home reasonable in response to perceived flight from officers and continued refusal to permit officers and EMTs to aid individual in drug overdose); *see also, e.g.*, *Carpenter v. Gage*, 686 F.3d 644, 647 (8th Cir. 2012) (finding the use of a taser reasonable where, when officers responded with paramedics to a 911 call for medical aid at plaintiff's home, plaintiff threatened them with a baseball bat and officers were told by the caller that plaintiff had a gun). Those circumstances, however, were largely absent when Kent was tased in his guest bedroom. Carefully balancing the unique facts presented in this totality-of-the-circumstances analysis, we conclude that "the nature and quality of the intrusion on [Kent's] Fourth Amendment interest[s]" outweighs "the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. Deputy Lopez's use of a taser was objectively unreasonable here.

## 2

The second question in the qualified immunity analysis asks whether, at the time of the incident in September 2013, it was clearly established that Kent had a right not to be tased under these circumstances. The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011); *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *Mullenix v. Luna*, 577 U.S. ___, 136 S. Ct. 305, 308 (2015). An officer violates clearly established law and loses that immunity when, at the time of the challenged conduct, "'[t]he contours of [a] right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Supreme Court "'do[es] not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Stanton*, 134 S. Ct. at 5 (quoting *al-Kidd*, 131 S. Ct. at 2083); *Mullenix*, 136 S. Ct. at 308; *Rudlaff*, 791 F.3d at 643 ("[E]xisting case law . . . must put the precise question 'beyond debate.'" (quoting *al-Kidd*, 131 S. Ct. at 2083)). The law is clearly established when the plaintiff can point either to "cases of controlling authority in his jurisdiction at the time of the incident,"

or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *see also, e.g.*, *al-Kidd*, 131 S. Ct. at 2083-84 (applying the standard from *Wilson*); *Sheehan*, 135 S. Ct. at 1776-78 (same).

The deputies first argue that this inquiry must be limited to the "community caretaker" context and emphasize that no case has expressly prohibited the use of a taser when officers are securing a scene for emergency personnel. This narrow definition, however, is contrary to guidance from the Supreme Court and this Circuit. The Supreme Court has "repeatedly" cautioned that courts should not define the right in question with a "high level of generality," but should instead base their analysis on a reasonably particularized definition. *al-Kidd*, 131 S. Ct. at 2084. Indeed, we have noted that an overbroad definition is not only unhelpful, but doctrinally problematic: "If a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry *always* to answer the clearly established inquiry." *Hagans*, 695 F.3d at 508. An overly restrictive definition like the one the deputies promote also poses problems: "If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Id.* Indeed, the Supreme Court "do[es] not require a case directly on point." *al-Kidd*, 131 S. Ct. at 2083; *see also St. John*, 411 F.3d at 774 (noting that reviewing courts are not restricted to the precise "factual context of a prior case"). Confining the clearly-established inquiry to "community caretaker" cases risks undermining the purposes of § 1983 and conflicts with clear directives from the Supreme Court.

With those directives in mind, we turn to whether, in September 2013, it was clearly established that it was excessive force to tase an individual who refused to comply with officers' commands to calm down and yelled at emergency responders, but was never told he was under arrest, never demonstrated physical violence, and had his arms in the air and his back to the wall when tased. Under recent precedent assessing the state of the law in 2010, we must answer that question in the affirmative.

It is clearly established in this Circuit that "the use of a Taser on a non-resistant suspect" constitutes excessive force. *Kijowski*, 372 F. App'x at 601. Conversely, it is also clearly established that tasing a suspect who "actively resists arrest and refuses to be handcuffed" does not violate the Fourth Amendment. *Hagans*, 695 F.3d at 509. Relying again on *Eldridge*'s statement that active resistance involves "noncompliance . . . paired with [] signs of verbal hostility," *Eldridge*, 533 F. App'x at 535, the deputies argue it was clearly established that Kent's failure to comply with commands to calm down amounted to "physical defiance" and his shouts at the deputies and EMTs amounted to "verbal belligerence," such that he was "actively resisting arrest." But in *Goodwin*, we recently rejected that very argument. Instead, we held that, as of June of 2010, it was clearly established that the use of a taser in response to very similar behavior—refusing to comply with commands to leave an apartment and saying as much to officers, when the claimant was never told he was under arrest and posed little safety threat to officers—constituted excessive force. 781 F.3d at 326. If the claimant in *Goodwin* had a clearly established right to be free from the use of a taser in 2010, then it must be said that Kent had the same clearly established right in September 2013.

We have also held that, since mid-2005, "[t]he general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued, is not told he is under arrest, and is not resisting arrest." *Grawey*, 567 F.3d at 314 (citations omitted); *see also, e.g., Thomas*, 489 F. App'x 116, 125 (holding it was clearly established that an "officer's tasing a once-disobedient suspect who has stopped resisting constituted excessive force, as of August 23, 2009"). As we have noted, Kent was never told he was under arrest, and—like the claimant in *Goodwin*—there is no evidence that he had reason to believe he was being detained. *Goodwin*, 781 F.3d at 326. In this interlocutory appeal, we also accept Kent's account that his arms were raised and his back was against the bedroom wall just before he was tased. Again, that posture indicated submission or, at the very least, minimized any safety threat he posed to those on the scene. Accepting Kent's version of the facts and based on the law before us, we must conclude that Kent—a man who yelled at officers and refused to comply with commands to calm down, but was never told that he was under arrest, never demonstrated physical violence, and had his arms in the air and his back to the wall when tased—had a right to

be free from the use of a taser under these circumstances, and in September 2013, "'[t]he contours of [that] right [were] sufficiently clear'" to the deputies.

In his thoughtful dissent, Judge Suhrheinrich suggests that we should look to guidance in the Eleventh Circuit with respect to the facts that give rise to a constitutional deprivation. But surely it demands too much from law enforcement personnel to be aware of the "clearly established" holdings of other circuits. Where Sixth Circuit law is clear, it controls. *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002) ("In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.").

**B**

A few other matters remain. Deputy Maher, first, is not entitled to qualified immunity in Kent's inaction claim. Since Deputy Lopez's use of the taser under these facts constituted excessive force in September 2013, it follows that Maher "had reason to know that excessive force would be or was being used." *Goodwin*, 781 F.3d at 328 (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Maher also had "the opportunity and the means to prevent the harm from occurring." *Id.* She was in the bedroom for the majority of the incident, communicated with Lopez as the events unfolded, and was facing Kent when she heard Lopez warn Kent that he would use the taser. She was close enough to handcuff Kent immediately after the taser was deployed. *Contra Turner*, 119 F.3d at 429-30 (finding that plaintiff could not establish an inaction claim where officer was not facing the arrestee when another officer used force, and did not communicate with the other officers beforehand). Kent has presented sufficient evidence to give rise to a jury question as to whether a reasonable officer in Maher's position would have observed Deputy Lopez's use of the taser and would have taken action to prevent Lopez from applying it. *Goodwin*, 781 F.3d at 329.

The same is true of Kent's state law assault and battery claims. Since it was clearly established that the use of a taser under these circumstances constituted excessive force, Deputies Lopez and Maher cannot show that their conduct was "undertaken in good faith" and without a "wanton or reckless disregard of the rights of another." *See Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008) (citations omitted); *Scozzari v. City of Clare*, 723 F. Supp. 2d 974, 978

(E.D. Mich. 2010) (citing *Odom*, 760 N.W.3d at 225), *aff'd sub nom. Scozzari v. Miedzianowski*, 454 F. App'x 455 (6th Cir. 2012); *see also* Mich. Comp. Laws § 691.1407(3). The deputies are not entitled to governmental immunity under Michigan law. Finally, the deputies' challenges to the district court's factual determinations have no place in this *de novo*, interlocutory appeal.

## III

For these reasons, we **AFFIRM** the district court's decision denying the deputies qualified and governmental immunity.

———————————

**DISSENT**

———————————

SUHRHEINRICH, Circuit Judge, dissenting.  Because I believe the majority analyzes the deputies' conduct through the lens of hindsight in denying them qualified immunity, I dissent. *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (holding that whether an officer's use of force was "objectively reasonable" must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").  Granted, Deputy Lopez's use of the Taser was a close call.  But that is the point of qualified immunity: to give credit to officers' judgment in ambiguous situations.  *See id.* at 397 (stating that courts must make "allowance for the fact that officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving").

I.      **Deputy Lopez's Use of the Taser**

First, I believe that Deputy Lopez's use of the Taser was an objectively reasonable use of force and not a constitutional violation.

A brief review of the facts "taken in the light most favorable to the plaintiff but viewed from the perspective of a reasonable officer on the scene" explains why the deputies' actions were objectively reasonable.  *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).  The EMTs and Deputy Lopez arrived at the scene in response to a call reporting the death of Kent's father. They proceeded to the upstairs bedroom where Kent's father was lying in bed.  Firefighter-EMT Oryszczak advised Kent that he had a duty to attach an AED to Kent's father, apparently to determine whether Kent's father was in fact dead, and to "do everything he could for him" if he was not.  Kent flew into a tirade, shouting at Oryszczak that "he was not going to assault my dead father."  Oryszczak told Deputy Lopez "he had an obligation to render aid to the deceased and could not because he was in fear of Michael Kent intervening."  Deputy Maher arrived, and Kent repeated his threat to the EMT personnel and deputies that "they were not going to assault my dead father or I was going to call the police and have them thrown in jail."  Deputy Lopez explained the EMT's duty to act to Kent, and Deputy Maher commanded Kent to calm down.

Kent retorted: "I did not have to calm down, that it was my home, and that they were not going to assault my dead father in my home against his wishes." At that point, Deputy Lopez pulled out his Taser and warned he would use it if Kent would not calm down and leave the room. Appellee Br. 9.[1] Kent did not leave the room. Standing in front of the wall, Kent instead raised his hands above his head and taunted, "Go ahead and tase me then." *Id.* Deputy Lopez then deployed his Taser for a five-second cycle. *Id.* at 10. Kent fell to the floor, and Deputy Maher handcuffed him. *Id.* EMTs "ran a strip" on Kent's father that indicated not to attempt resuscitation. EMTs later removed the Taser probes and dressed Kent's wounds, which did not require further medical attention.

The undisputed facts establish that Deputy Lopez applied minimal force to secure Kent's submission so that Oryszczak and the other EMTs could perform their duties without fear in an emergency situation. Yet the majority dismisses this emergency as insufficiently serious compared to the situation in *Stricker v. Township of Cambridge*, 710 F.3d 350, 364-65 (6th Cir. 2013). Maj. Op. at 14-15. In *Stricker*, the court found that pointing a taser gun, using a pressure hold, and handcuffing did not violate the Fourth Amendment where the plaintiff had repeatedly repelled officers' attempts to respond to a 911 call reporting her son's potential drug overdose. *Id.* at 355-56. A principal justification for the officer's use of force in *Stricker* was the plaintiff's "earlier attempts to prevent medical personnel's access to [the son who overdosed]." *Id.* at 365. Like the officers in *Stricker*, Deputies Lopez and Maher faced an individual blocking their attempts to examine and assist a person in potential medical distress. The majority trivializes the perceived emergency here because the officers "knew they were responding to a natural death investigation." Maj. Op. at 15. But this assessment disregards the EMTs' duty to test for signs

---

[1]The majority assumes that Deputy Lopez commanded Kent only to calm down, and not to leave the room, because neither Kent nor any other witness recalls in their written statements that Deputy Lopez ordered Kent to leave the rom. Maj Op. at 5 n.2. Kent, however, admits in his brief that "Deputy Lopez then pulled out his taser and told Dr. Kent to calm down *and to leave the room* or he would use the taser." Appellee Br. 9 (emphasis added). Because Kent admits in his brief that Deputy Lopez gave this command, this fact is part of "plaintiff's facts" and thus may be considered for the purpose of reviewing a denial of qualified immunity. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013) ("a defendant denied qualified immunity may appeal only if the issue on appeal is whether the plaintiff's facts, taken at their best, show that the defendant violated clearly established law"); *see also Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 435 (6th Cir. 2006) (considering a fact admitted in a party's brief for purposes of reviewing a grant of summary judgment); *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 316 (6th Cir. 1998) (same). Furthermore, in the district court, Kent neither denied that Deputy Lopez ordered him to leave the room nor presented facts inconsistent with Deputy Lopez giving this command, making this fact effectively undisputed.

of life and, if Kent's father was still alive, provide medical assistance. It also fails to perceive the officers' understandable sense of urgency to enable the EMTs to act quickly since an AED must be administered within minutes of a cardiac arrest to restore life, *see* Maj. Op. at 3 n.1, leaving little time for verbal persuasion or other more tentative measures.[2]

The majority also mischaracterizes Kent's behavior as submission or, at most, passive resistance. The opinion contrasts Kent's behavior with the intoxicated and threatening plaintiff who fled police in *Caie v. West Bloomfield Township*, 485 F. App'x 92, 96-97 (6th Cir. 2012), where the court upheld use of a Taser, and likens it to the single act of disobedience and verbal defiance in *Goodwin v. City of Painesville*, 781 F.3d 314, 323-24 (6th Cir. 2015), where the court held use of a Taser unreasonable. *See* Maj. Op. at 10-14. Neither *Caie* nor *Goodwin*, however, establishes that Kent's aggressive and arguably threatening behavior posed mere passive resistance. Although Kent was not intoxicated, did not threaten the officers or EMTs with physical harm, and did not run from the police like the plaintiff in *Caie*, his behavior was equally volatile. He obstructed emergency medical treatment, disobeyed the officers' orders when they attempted to allow the EMTs to perform their duties, placed the EMTs in fear of violence, and goaded the police officers into using physical force. Kent's repeated protest that "they [the EMTs] were not going to assault my father" implied (and a reasonable officer could certainly infer that) he would physically stop the EMTs from attaching the AED, as indicated by Oryszczak's statement to Deputy Lopez that he "was in fear of Michael Kent intervening." Reacting to the perceived medical emergency and the threat of physical interference with medical personnel, Deputy Lopez reasonably used a single five-second Taser cycle to deescalate Kent's aggression and restore order, similar to the officer in *Caie* "neutralizing what a reasonable officer could perceive as a dangerous situation." *Caie*, 485 F. App'x at 97.

---

[2]The majority also distinguishes *Stricker* by noting it "did not involve a tasing." Maj. Op. at 15. But the fact that Deputy Lopez used a Taser instead of a pressure hold speaks only to the different kind of resistance each officer encountered in the moment; the plaintiff in *Stricker* was crouching down in a closet, and the officer used a pressure hold to force her to stand, *Stricker*, 710 F.3d at 356, whereas Kent was standing, yelling, and refusing to leave the room so EMTs could perform their job. Kent's more volatile resistance justifies a more substantial application of force. *See Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006) (noting that the objective reasonableness standard includes "'a built-in measure of deference to the officer's on-the-spot judgment about *the level of force* necessary in light of the circumstances of the particular case'" (emphasis added) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002))).

*Caie* actually supports Deputy Lopez's use of a Taser in this situation.  The plaintiff in *Caie* was tased only after he was "taken to the ground" and refused to move his hands for handcuffing.  *Id.* at 94.  Even though the *Caie* plaintiff was "arguably subdued" and the risk of harm or flight had been minimized, the court upheld the tasing because the plaintiff "continued to be uncooperative."[3] *Id.* at 97. Kent similarly charged his apparently non-threatening posture with a defiant dare to "go ahead and tase me then."  Deputy Lopez could reasonably have perceived this behavior as a continued threat and not submission.  In response, Deputy Lopez used the minimum amount of force necessary to stabilize the situation.

Nor is Kent's behavior akin to the plaintiff's single act of disobedience in *Goodwin*. Kent admittedly disobeyed at least two direct police commands, refused to cooperate with Deputy Lopez's attempts to explain EMTs' duties to act, repeatedly shouted at EMT personnel and the police, and dared the officers to use physical force.  The *Goodwin* plaintiff disobeyed and verbally defied only one police command to step outside his apartment.  *Goodwin*, 781 F.3d at 319, 326.  Moreover, Deputy Lopez acted under emergency conditions not present in *Goodwin*, which involved an arrest for disorderly conduct.  Deputy Lopez had to act quickly to restrain Kent from delaying potentially urgent medical aid; in contrast, the *Goodwin* officers had little reason to tase the plaintiff before attempting less forceful measures to carry out the arrest.

An Eleventh Circuit case presents a closer factual scenario to this case than either *Caie* or *Goodwin* and confirms that Deputy Lopez's decision to tase Kent did not violate the Constitution.  In *Draper v. Reynolds*, 369 F.3d 1270, 1272-73, 1278 (11th Cir. 2004),[4] the court

---

[3]Lower courts in our circuit have similarly upheld the tasing of handcuffed individuals when they continue to exhibit verbal defiance and noncompliance with police orders. *See Alexander v. City of Shelby Twp.*, No. 07-cv-14741, 2009 WL 3241974, at *2 (E.D. Mich. Oct. 8, 2009) (finding the tasing of a handcuffed plaintiff not excessive force where plaintiff disobeyed multiple orders to enter the patrol car and had displayed a belligerent and threatening attitude since his arrest); *Devoe v. Rebant*, No. 05-71863, 2006 WL 334297, at *6-7 (E.D. Mich. Feb. 13, 2006) (finding the tasing of a handcuffed plaintiff not excessive force because the plaintiff, who had been "hostile and uncooperative" from the start of the police encounter, "still was resisting the officers' commands to enter the police car and was arguing with them").

[4]This out of-circuit case is relevant in analyzing whether Deputy Lopez's conduct violated the Constitution in the first instance—not in determining whether his conduct violated a "clearly established" constitutional right.  As this opinion does not reach the "clearly established" prong of the qualified immunity analysis, it does not rely on *Draper* to show that Deputy Lopez reasonably relied on out-of-circuit law in tasing Kent.  Rather, this opinion looks to *Draper* as guidance for what constitutes an objectively reasonable police response to behavior closely analogous to Kent's. The majority's expressed concern that reference to this Eleventh Circuit case would effectively require

held the use of a Taser gun at a traffic stop reasonable in response to the plaintiff loudly insisting he had done nothing wrong, accusing the officer of harassing him, repeatedly refusing to produce documents the officer requested, and stating, "I'm not going to kiss your damn ass because you're a police officer." The plaintiff never directly threatened to use physical force, and the officer never informed the plaintiff he was under arrest. *Id.* at 1272-73. Yet the court found the officer's use of a Taser gun reasonable even without a verbal arrest command in response to the plaintiff's "hostile, belligerent, and uncooperative" attitude; noncompliance with multiple police commands; complaints of police harassment; and repeated yelling at the officer. *Id.* at 1278. Here too, Kent was hostile and uncooperative, accused both the EMTs and officers of "assault[ing]" his father, ignored repeated commands to calm down and exit the room, and yelled at everyone around him. As *Draper* indicates, just because Kent was not told he was under arrest, never expressly threatened to use violence, and never physically resisted the officers does not mean he could disobey and verbally antagonize the officers with impunity.

Notably, the majority does not suggest what Deputy Lopez should have done instead of tasing Kent. A key reason judges should give deference to officers' judgment in difficult scenarios like this one is the inability of courts to recommend an alternative course of action for police officers. *See Eldridge v. City of Warren*, 533 F. App'x 529, 538 (6th Cir. 2013), (Norris, J., dissenting) (observing that "the majority's opinion offers little guidance to officers confronting a similar situation in the future"). It is undisputed that Oryszczak told Deputy Lopez he was fearful Kent would assault him if he tried to administer the AED. From Deputy Lopez's perspective, then, a failure to act could have resulted in a delayed medical response and a loss of life to Kent's father. Attempting a verbal arrest command and physical removal of Kent could have led to a physical altercation that likely would have harmed Kent, the EMTs, or the deputies more than a five-second Taser cycle and would have further delayed any resuscitation attempt had Kent's father been alive. *See Draper*, 369 F.3d at 1278 ("a verbal arrest command accompanied by attempted physical handcuffing, in these particular factual circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt"); *see also Hagans v.*

---

law enforcement to learn "the 'clearly established' holdings of other circuits" is, therefore, unfounded. Maj. Op. at 20.

*Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 510 (6th Cir. 2012) (noting that Tasers present "a significantly lower risk of injury than physical force"). Confronted with this unpromising set of options, Deputy Lopez's decision to tase Kent can hardly be branded "objectively unreasonable."

In truth, the only person in the room that day who acted objectively unreasonable was Kent. Although understandably distraught over the very recent death of his father, Kent's disrespect and outright aggression towards EMT personnel and police created needless upheaval over what turned out to be mere confirmation that Kent's father was dead. We expect our police officers to exercise restraint and use good judgment, but that does not divest ordinary citizens—especially highly educated ones like Kent—of their own responsibility to use self-control and comply with reasonable police commands. Kent's irate overreaction created a stressful, difficult situation that forced Deputy Lopez to make a split-second, perhaps imperfect, but nevertheless reasonable judgment to subdue Kent by tasing. Kent should not be allowed to recover now because he believes Deputy Lopez's judgment was mistaken.

Because I find Deputy Lopez's use of the Taser to subdue Kent did not violate the Constitution under the version of facts most favorable to Kent, I would reverse the district court's denial of qualified immunity to Deputies Lopez and Maher. Under the same analysis, I would reverse the district court's denial of governmental immunity to the deputies on Kent's state law assault and battery claims.

## II. Deputy Maher's Failure to Intervene

Even if Deputy Lopez's use of the Taser violated Kent's right to be free from excessive force, Deputy Maher did not violate that right because the tasing lasted only five seconds, leaving Deputy Maher no realistic opportunity to intervene.

Police officers may be liable for failing to protect a person from excessive force if the officer knew or should have known that excessive force would or might be used, and the officer had both the opportunity and means to prevent the harm from occurring. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). No duty to intervene exists, however, where one officer's act of excessive force occurs so rapidly that a second officer on the scene lacks "'a realistic opportunity to intervene and prevent harm.'" *Wells v. City of Dearborn*, 538 F. App'x 631, 640

(6th Cir. 2013) (quoting *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 507 (6th Cir. 2007)).

The majority claims that Deputy Maher had the opportunity to prevent the tasing here because she was in the bedroom with Deputy Lopez and Kent, she saw Deputy Lopez point the Taser at Kent, and she was standing close enough to Kent to handcuff him after he was tased. Maj. Op. at 19-20. But our case law makes clear that where an instance of excessive force lasts only a matter of seconds, officers have no opportunity to intercede and therefore cannot be held liable for failing to prevent the violation. *See, e.g., Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (finding an officer had no opportunity to prevent two strikes to the plaintiff's head because the span of time for intervention "could not have been more than a few seconds"); *Wells*, 538 F. App'x at 640 (finding no opportunity to prevent a knee strike and tasing where the acts were "rapid" and did not constitute an "extended string of abuses"); *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (finding no opportunity to prevent a "takedown" that lasted no more than ten seconds); *Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012) (finding that officers had no opportunity to stop a tasing that "could only have lasted for a fraction" of the entire altercation with police, which itself lasted only minutes); *Ontha*, 222 F. App'x at 506-07 (finding officer who was a passenger in a patrol car that ran over a fleeing suspect lacked opportunity to "implement preventative measures within a short time span of six to seven seconds").

*Kowolonek v. Moore* is particularly on point. In *Kowolonek*, the plaintiff alleged that one of the five officers attempting to detain him threatened to use a Taser and then did so after the plaintiff stated "a Taser would be the only way to get [me]." 564 F. App'x at 533. The court rejected the plaintiff's "failure to intervene" claim against the officers who witnessed the tasing, ruling that "[e]ven if Kowolonek can show that the officers had reason to know a taser would be used against him" due to the tasing officer's warning, the officers lacked the opportunity to stop the tasing because the entire altercation lasted only minutes, and the use of the taser "could only have lasted for a fraction of this time." *Id.* at 539. This Court reached the same result in another tasing case, *Wells v. City of Dearborn*, 538 F. App'x at 640, because the tasing there occurred only once and at a "fleeting point[] in time." The court reasoned that "in the absence of ongoing,

repeated tasing, there was no way for [the officers] to intervene and prevent harm." *Id.* As in *Kowolonek* and *Wells*, Deputy Lopez discharged his Taser only once, and the Taser application lasted only five seconds. Appellee Br. 10. And like the tasing officer's warning in *Kowolonek*, Deputy Lopez's warning that he would use the Taser did not change the brief duration of the force itself and, therefore, did not create an opportunity for Deputy Maher to intervene.

For these reasons, the majority's reliance on *Goodwin* is misplaced. There, we found that the plaintiff stated a constitutional violation where the officers confronted "a prolonged application of force"—a twenty-one-second initial tasing followed by an additional five-second tasing—because the officers could have interrupted the abuse or at least prevented its repetition. *Goodwin*, 781 F.3d at 319, 329. As stated, Deputy Maher could not have acted in five seconds. Thus, Deputy Maher is entitled to qualified immunity in any event.

For the foregoing reasons, I respectfully dissent.